Nat H. Hentel, J.
The parties in this non jury case have submitted the issues for determination by the court upon an agreed statement of facts. The brief of the defendant Port of New York Authority rightly describes this case as one involving ‘ ‘ in a novel context the question of whether the relationship between the operator of a parking lot and a user thereof is a bailment or a license with respect to the operator’s liability for the theft of a vehicle from that lot ”.
As the defendant claims, this appears to be a case of first impression in this State. The defendant, furthermore, seeks to distinguish two recent Queens Civil Court cases involving missing motor vehicles from public parking lots 1 and 3, maintained at the John P. Kennedy International Airport in Queens, wherein my colleagues Judges Hammer and Lakritz held that a bailment status existed. (See Liberty Mut. Ins. Co. v. Meyers Bros. Operations, 64 Misc 2d 648 [Nov. 2, 1970], and Ellish v. Airport Parking Co. of America, 66 Misc 2d 470 [May 4, 1971].) It is the defendant’s claim that these two cases are “ obviously distinguishable from the present action in that each involved a parking lot operation where, as each patron entered, he or she received a ticket from an attendant or machine, and to leave the lot this ticket had to be surrendered to an employee of the lot operator or proof of ownership presented.” The defendant argues that the procedure involved in the Liberty Mutual and Ellish cases (supra) was “ sufficient control on the part of the lot operator to create ” a bailment contract involving all of the traditional elements of delivery, acceptance and dominion inasmuch as the parking attendant at the exit gate not only collected parking fees but also could prevent a vehicle from leaving the lot without proper credentials. The defendant’s main points here are that ‘ ‘ no attendant at all was present every day of the month but one; the lot involved was designed solely to keep cars of other than employees out; and that once a car was in this lot, “ anyone could leave the lot ”. Under the circumstances, the defendant denies that any bailment relationship arose, and that, in any event, it is plaintiff’s burden, which plaintiff did not *304 sustain, to prove negligence since ‘1 it should be obvious that the loss of plaintiff’s vehicle must have been due to theft”; and other than that statement defendant offers no explanation to account for the missing vehicle.
A recital of the stipulated facts in this case is in order since the decision in this matter is of some consequence to the defendant. Emphasis is supplied by the court (infra) with respect to certain of the critical facts upon which this court places considerable weight in arriving at its decision:
1. The defendant, Port of New York Authority, operates the John F. Kennedy International Airport located in Queens County under a lease from the City of New York.
2. As of June 17, 1970, and to the present date, the defendant operates, controls and maintains Parking Lot No. 7, which is made exclusively available to employees of subtenants of the defendant, namely the various airlines. The defendant admits in its brief that such lot is an “ employee parking lot * * * to help accommodate the more than 40,000 persons employed at the Airport * * * pursuant to contractual agreements between the defendant and the subtenant airlines.”
3. In this case, plaintiff was employed by Trans-Carribean Airways, a subtenant of the defendant, on June 17, 1970, and Trans-Carribean Airways had an agreement in writing with respect to parking facilities at the airport for its employees.
4. On June 17, 1970, plaintiff was the owner of a 1965 Buick sedan valued at $700.
5. On June 17, 1970, plaintiff parked her automobile in Parking Lot No. 7 at the airport. When she returned at about 6:00 p.m., on that date, the vehicle was missing, and as of current date, plaintiff has not recovered her vehicle.
6. it is agreed that prior to June 17, 1970, Trans-Carribean had requested, pursuant to its agreement with defendant, that defendant issue a permit for plaintiff employee to park her vehicle in Lot. No. 7. Trans-Carribean prepared an “ Employee Parking Permit Sales Voucher ” for plaintiff employee which it presented to defendant in due course; and defendant thereupon issued plaintiff a magnetic card pass and a windshield sticker for plaintiff’s automobile. The cost of each permit is $10 per month, which is paid to the defendant by the employer which, in turn, and in this case, passed this charge on to the plaintiff through a monthly payroll deduction. (Thus, plaintiff actually paid the defendant’s charge for this parking privilege.) In addition to the right to park at Lot No. 7, the plaintiff received free bus transportation between that lot and the central terminal area. The $10 monthly charge was set to cover *305 the costs of the bus service, as well as the costs of operation of the lot and the New York City parking tax.
7. The procedure for parking plaintiff’s vehicle in Lot No. 7 was as follows: Upon driving up to the entry gate to Lot No. 7, an employee, such as plaintiff, inserts her magnetic card into a slot in the control console at the entrance lane, and if the card contains the correct code (as it did here), a gate would mechanically open allowing one vehicle to enter the lot. The employee would then select a parking space, park the car, and lock it or leave it unlocked as desired, and then take the bus to the central terminal area. Upon returning to the lot, the employee would drive his or her vehicle into the exit lane of the lot and up to an exit gate, which would then automatically raise the gate to allow any car to leave the lot. No card or other identification was necessary to permit a vehicle to leave Lot No. 7.
8. It is further stipulated that no employee of the defendant is ordinarily present at the entry or exit gates to Lot No. 7, except that one day a month employees of the defendant check the cars entering the lot to see that proper cards and windshield stickers were used. No attendant ordinarily watches the entry or exit of vehicles to or from the lot.
9. Also stipulated is the fact that each day, except during the hours of 8:00 a.m. to 1:00 p.m., the defendant had one of its Port Authority Police Officers on duty in Lot No. 7. This officer was not instructed to check or watch over the cars parked in this lot, but was present for general security purposes only. Furthermore, other employees of the defendant are present in Lot No. 7 from time to time to perform cleaning and maintenance services but these employees have no duties with respect to automobiles parked in the lot.
10. On June 17, 1970, Lot No. 7 had a capacity of 2,900 vehicles and the lot was lighted and completely enclosed by a fence with the exception of the entry and exit lanes providing the only vehicular ingress and egress.
11. Finally, it was stipulated that neither of the parties has any further knowledge concerning the circumstances of the disappearance of plaintiff’s automobile from Lot No. 7.
Before discussing these facts and coming to a conclusion on the law of the case, this court takes judicial notice of certain other facts about which the parties did not stipulate, but which the court on its own volition obtained from the Port of New York Authority Police Department through the District Attorney’s office of Queens County. During the period 1964 through 1970, the following number of vehicles were stolen or reported missing from all the parking lots located at the airport:
*306 Year
Vehicles Reported Stolen or Missing
1964 ................................. 110
1965 ................................. 162
1966 ................................. 237
1967 ................................. 333
1968 ................................. 433
1969 ................................. 499
1970 ................................. 547
These figures clearly demonstrate the sharply rising incidence of vehicle disappearances and thefts from the airport prior to June 17, 1970, and the increasing vulnerability of the airport as a target for car thieves. These facts, of course, were known to the defendant.
If this were a jury case, and the facts would have been established as they are here, it would normally be incumbent upon the court to review and charge the jury with the applicable law which would have to be applied to the facts. This I will now do much as I did in my opinion dealing with bailments and a missing automobile in Rosen v. Village Chevrolet (63 Misc 2d 174 [decided May 26, 1970]).
a) The New York Court of Appeals has enunciated that “ "Whether a person simply hires a place to put his car [licensorlicensee relationship] or whether he has turned its possession over to the care and custody of another [bailor-bailee relationship] depends on the place, the conditions, and the nature of the transaction.” (Osborn v. Cline, 263 N. Y. 434, 437 [1934], italics supplied; Diamond v. Foote, 109 N. Y. S. 2d 831, 833).
b) A mere license is a common-law right by which a party may use the land of another without committing a trespass, and it refers only to the use of real property. (17 N. Y. Jur., Easements & Licenses, § 3).
c) A bailment is a bilateral relationship between the parties concerning an item of personal property. It is “ a delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be (6 C. J., Bailments, § 1). It is essential that there be either an actual or constructive delivery by the bailor as well as an actual or constructive acceptance by the bailee ”. (Mays v. New York, N. H. & H. R. R. Co., 197 Misc. 1062, 1063-1064, italics supplied; Osborn v. Cline, supra).
*307 d) ‘ ‘ There must be an acceptance of the article bailed ’ ’ by the bailee. Acceptance can be proved “ either directly or by circumstances showing a constructive acceptance. * * * since the relation is founded on contract, either express of implied, the duty and liability springing therefrom ordinarily cannot be thrust upon [an intended bailee] without his knowledge or consent, but must be voluntarily assumed by the party himself or some authorized agent.” (5 N. Y. Jur., Bailment §§ 8, 13, italics supplied).
e) “ When a bailment is for the sole benefit of the bailor, it is a gratuitous bailment, and the bailee is only liable if he is guilty of gross negligence with respect to the bailed property if it is damaged or lost. (Dalton v. Hamilton Hotel Operating Co., 242 N. Y. 481.) ” “A bailment for mutual benefit requires the bailee to exercise that degree of care which a reasonably careful owner of similar goods would exercise under the same circumstances. (Castorina v. Rosen, 290 N. Y. 445.) * * * In the case of a mutual bailment there is a presumption of negligence, or in the case of a gratuitous bailment, there is a presumption of gross negligence, which arises from proof of bailment and failure to deliver the said bailed property. (Dalton v. Hamilton Hotel Operating Co., supra.) ” (Rosen v. Village Chevrolet, supra, at p. 176, italics supplied.)
f) “A bailee for mutual benefit is not an insurer and no liability exists for loss of property by [bailee] * * * where negligence has not been established”. (Zaritsky v. Thrifty 381 Stores, 67 Misc 2d 148, 149, italics supplied.)
g) “A bailment does not necessarily and always, though generally, depend upon a contractual relation. It is the element of lawful possession, however created, and the duty to account for the item as the property of another that creates the bailment, regardless of whether such possession is based on contract in the usual sense or not.” (Ellish v. Airport Parking Co. of America, supra, at pp. 471-472, italics supplied.)
h) Has the defendant in this case offered any excuse or reason for the disappearance of the plaintiff’s vehicle? All defendant says is that he has “ no knowledge concerning the disappearance ” and, therefore, it is assumed that a theft was committed. (See stipulated facts, supra.) “ It would seem to the court that the defendant has the duty of showing that he exercised ordinary care and that the disappearance of the automobile occurred through no fault of the defendant. * * * Ordinarily loss by theft is usually a good defense provided that the defendant did not contribute thereto by the negligent operation of the place in which the bailed property was kept. However, it will not stand *308 in the face of proof that the bailee was negligent and contributed to and made the theft possible.” (Ellish v. Airport Parking Co. of America, supra, at p. 472.)
i) “ Dominion [by the bailee over the personal property] is not altered or diminished by the fact that the parking lot operator does not park the car or does not know which stall in which it is parked. ” (Ellish v. Airport Parking Co. of America, supra at p. 473, italics supplied; Makower v. Kinney System, 65 Misc 2d 808, 810.) “ One can certainly exercise dominion without immediate knowledge thereof.” (Makower, supra, at p. 811.)
j) The mere fact that plaintiff did not turn over her vehicle’s keys to defendant after she parked the vehicle does not absolve the defendant of its responsibility if, in fact, a bailor-bailee relationship existed. This fact does not negate the fact that plaintiff turned the possession of her car over to the defendant for safekeeping if, in fact, a bailor-bailee relationship existed. (Liberty Mut. Ins. Co. v. Meyers Bros. Operations, supra, at p. 650; Palazzo v. Katz Parking Systems, 64 Misc 2d 720.) Once the facts indicate that a bailment between the parties was intended, it is “ not changed into a mere license by the fact that plaintiff’s assignor parked, locked and took the keys from the vehicle ” where “ defendant’s procedure indicates that it exercised custody and control over the parking lot in question and the vehicles therein.” (Continental Ins. Co. v. Meyers Bros. Operations, 56 Misc 2d 435, 438, italics supplied.)
k) Once a bailment is established by the facts, whether for hire, gratuitous or for mutual benefit, and there is a showing that the bailed property has not been produced by the bailee for redelivery to the bailor, the presumption of either ordinary or gross negligence which arises therefrom shifts the burden of proof from the bailor to the bailee (defendant), “ who must then come forward with an explanation of the loss or damage. * * * The explanation must show with reasonable certainty how the loss occurred whether by theft or fire or otherwise. * * * It is not enough to show that bailee used reasonable care in its custody of the bailed property if ‘ mysterious disappearance ’ is the only explanation. * * * Proof of loss by theft or other explanation does not necessarily discharge the bailee from liability. # * * The explanation simply removes the presumption of negligence in the case, leaving bailor [plaintiff] again with the burden of proving that the loss resulted from defendant’s negligence. * * * If the bailee defaults in going forward to establish by proof a legally sufficient explananation concerning the loss of the bailed property in order to, rebut the presumption of negligence, which is a question of law *309 for the court, then the bailor is entitled to judgment against the bailee.” (Rosen v. Village Chevrolet, supra, at pp. 176-177, Italics supplied.)
Having thus ‘ ‘ charged ’ ’ the applicable law, the court as the trier of the facts will now take judicial notice of some of the unique attributes and characteristics of the John F. Kennedy International Airport. On the basis of known statistics, it is the largest and busiest airport in the New York City metropolitan area. It is located on the northeastern shore of Jamaica Bay just north of the Rockaways fronting on the Atlantic Ocean. This, then, is at the southeastern edge — the far reaches — of New York City. It is not readily accessible by the usual methods of public transportation — bus or subway. The usual method of transportation to the airport is by private car or taxi. In the year 1970, when the loss of plaintiff’s car from the airport was reported, there were 43 hourly, 1,023 daily, and 373,427 annual flight operations conducted at the airport. The statistics represent the sum of aircraft landings and take-offs, and the high density of operational activity generated at the defendant’s airport. From these facts, we can readily project the millions of dollars of revenue involved in the purchase of passenger and freight services at the defendant’s facilities. This, of course, in turn, becomes the basis for substantial income production for the defendant which feeds upon rental fees paid by airline subtenants and servicing concessionaires. In 1970, the subtenant rent-payers employed some 40,000 personnel to process these passenger and freight operations. A tremendous number of people moved in and out of the airport every 24 hours; some 20,000,000 people or more annually since 1967.
In view of these judicially noticed facts, the court cannot but help to agree with plaintiff’s statement in its memorandum of law at page 10, which states: “ Human activity on such a high level of intensity appears to warrant, if not require, a renewed consideration of the rules of law governing the relation of parties to air travel ’ ’. As a natural corollary, the court extends such “ renewed consideration ” to the relation of the air travel industry and facility operators to their employees as well.
It is quite clear, in order for the airport to function properly and discharge its passenger and freight responsibilities, that parking facilities had to be provided at or near the central terminal area. This is a matter of vital necessity in view of the airport’s geographical location on the outskirts of the city. Then, again too, it was equally vital to provide adequate parking facilities for the employees of the airlines and others who, through the performance of their daily functions, make it pos *310 sible for defendant to fulfill its primary task of operating an airport.
The defendant did so, as per the stipulated facts in this case. One such employee parking facility was Lot No. 7, on June 17, 1970. It provided 2,900 employee exclusive parking spaces. It was lighted for 24 hour operation. It was fenced in except for the entrance and exit gateways. It was guarded on a daily basis by a Port of New York Authority police officer for “ general security purposes ”, about 20 hours a day, except for the hours 8:00 a.m. to 1:00 p.m. (It can very well be asked what was the police officer stationed there to guard or secure? The fence? The lights? The gate mechanism? The paving? Or was it the safety of personnel and the security of their property? Logic impels us to the latter consideration. The defendant’s reply memorandum at page 7 states: ‘ ‘ The patrolman is present in the lot for the same reason a patrolman walks a beat in the City — to prevent crime.” Car theft is a well-recognized crime.) Further, it had a mechanical gate guarding the entrance which was designed to exclude all but employees who carried the proper key- — -a magnetically coded passcard to open the gate. The lot could not be entered by an employee who had not paid (either himself or through his employer) a $10 monthly parking charge for which a monthly coded card gate-opener and an identifying windshield sticker were distributed to each paid-up employee. It was spot-checked, once a month, by employees of the defendant to see that only properly authorized, identified and paid-up employees were using that lot.
It would be illogical) senseless and incredible for this court to believe that the doing of all these enumerated things was merely an empty gesture on the part of the defendant to provide mere window-dressing for employees at the airport. The court can imagine the defendant saying: “ Here, you are, employees, here’s an exclusive lot to park your cars, but that’s it! You get nothing else! Only the chosen few, the paid-up employees, can drive in but, as it is stated in defendant’s memorandum of law at page 7, ‘ anyone could leave the lot ’.” Is the defendant saying that any person, whether entitled or not to possession of a vehicle, could drive a vehicle out of Lot No. 7? Is it defendant’s intention in setting up Lot No. 7, and supervising and maintaining it, to give away vehicles owned by employees to others not entitled thereto ? The defendant, after all, was receiving $29,000 a month from employees or their employers for the use of Lot No. 7 at $10 per 2,900 rental spaces. Was this sizeable sum to insure giveaways or thefts of employees’ stored cars? This makes no sense at all in view of the actual notice possessed by *311 the defendant of the sharply rising incidence of car thefts at the airport from 1964 to 1970. All of the safeguards and services performed by the defendant in maintaining Lot No. 7, and the contract between it and airline subtenants providing for employee parking, with the employees as third-party beneficiaries (Lawrence v. Fox, 20 N. Y. 268), do not spell out a mere license to use defendant’s land for parking by the plaintiff, and fellow employees.
The enumerated provisions advertise and proclaim that the defendant was providing a safe and guarded place exclusively for employees to park their cars and where, for a fee, the defendant further provided bus transportation for them to their places of employment in order to suffer them no inconvenience. In effect, the defendant was telling the employees and users of Lot No. 7: “ Don’t be concerned. Your car will be safe here. No one can get in hut you! Sure, the lot is out-of-the-way and may become a target for thieves or muggers (otherwise why the bus transportation 1), hut we have it fenced, and lighted, and guarded by a policeman, and we maintain it, and spot-check it for you. ’ ’
No, the court rejects the defendant’s argument that all of this was a mere license and holds instead, in support of the plaintiff’s contention, that all of these circumstances spell out a bailment for hire under the terms of the plaintiff’s employer’s contract with the defendant, and a bailment for mutual benefit due to the circumstances surrounding and implicit in an airport’s operation. There is ample evidence of delivery of plaintiff’s personalty into the custody of the defendant-bailee; of constructive acceptance of this personalty by defendant, who then exercised dominion over the personalty until it was reclaimed by the plaintiff-bailor. Only in this case, the bailee never redelivered the personalty to the bailor, and the circumstances surrounding its loss or disappearance are not otherwise satisfactorily explained by the bailee.
The defendant argues that the holdings in the Liberty Mutual and Ellish cases (supra) are inapplicable here. As to this argument, the court is totally unimpressed. To quote Judge Hammer in the Liberty Mutual case (supra, at pp. 649-650): “It has become the custom for air travelers to drive their cars, out of necessity, to an airport, and leave them in parking places or lots for a fee during their sojourn, to await their return. The traveler has no alternative but to park his car legally and in the places prescribed at the airport. He is, in effect, a captive customer of those operating the parking lots at the airport terminals. The court under such circumstances and the facts herein *312 will not countenance defendant’s shallow claim to avoid liability ”.
This doctrine was quoted by Judge Lakritz as well in the Ellish case (supra, at p. 473). Both the Liberty Mutual and Ellish cases deal, however, with members of the public coming to the airport on proper business and parking their vehicles for a parking fee in the public parking lots operated as concessions from the defendant to private parking operators. Here we are dealing with a parking lot operated by the defendant directly on behalf of airport employees. This court holds that the doctrine of the Liberty Mutual and Ellish cases is also equally applicable in this case by virtue of the same reasoning. The employees of the airport are “ captive customers ” too. In order for them to work, they must use their private transportation facilities to come to a not-readily-accessible airport. "Why should there be two standards of care available to the defendant — one for the paying public and one for the paying employeef There is no logic in holding that a bailment arises from the relationship with the public but only a license with respect to employees. This court will not provide the defendant with such absolution from its duty to exercise ordinary care to safeguard the personal property of one of its subtenant’s employees. The employee was paying for the right to park in Lot No. 7 in this case. But, the opinion of the court would be the same even if the plaintiff or Trans-Carribean were not required to pay a $10 monthly charge for parking. Whether a person parking his vehicle at the airport was a passenger on a flight or an employee of the transporting airline, or otherwise an airport employee, makes no difference. Each of these categories is equally as important to the furtherance of the defendant’s business — airport operation. The airport would be worthless without passengers; and the airport and its passengers would be ineffective without employees providing airport services. Thus, even without paying a parking fee, each category would nevertheless be protected by the degree of care required with respect to a baihnent for mutual benefit. “ The nature and amount of the compensation are immaterial, as the law will not inquire into its sufficiency or the certainty of its being realized by the bailee.” (See 5 N. Y. Jur., Bailment, § 10.)
Thus, the court extends by natural progression and common logic, the Liberty Mutual and Ellish cases doctrine to this case, and- declares that, under all the circumstances, a bailment for hire and/or mutual benefit was created and was in effect as between plaintiff and defendant on June 17, 1970, when plaintiff drove into and parked her vehicle in Lot No. 7.
*313 As a result, it became plaintiff’s burden to prove that defendant failed to exercise ordinary care (5 N. Y. Jur., Bailment, § 65), and was negligent in safeguarding her vehicle after it was delivered into defendant’s custody on June 17, 1970, and later that day failed to redeliver same to her. Plaintiff sustained her burden of proof initially when she reported that her car was missing from Lot No. 7. This caused a presumption of defendant’s negligence to arise, thus satisfying her burden of proof at that stage of this trial. (Textile Overseas Corp. v. Riveredge Warehouse Corp., 275 App. Div. 236.)
Thereafter, the burden of proof shifted to the defendant— to pick up the ball, so to speak, and to carry it f orward by showing some reasonable explanation for the missing vehicle which would neutralize the presumption of its negligence in dealing with plaintiff’s car. (Corrao v. Dewey Garage Corp., 24 N. Y. S. 2d 592.) In the Corrao case (supra) the court said, at page 594: ‘1 The bailee is bound, on request, to redeliver the thing bailed to its lawful owner, and while he may escape liability by showing that the goods had been lost without negligence on his part, he must so explain the loss. When there is a theft he is required, to evade liability, to show that the loss was 1 by occurrence beyond his control ’, giving ‘ proof * * * of the circumstances of the loss, and at least prima facie evidence of due care on his part ’; if he cannot return the property, he must ‘ explain the loss in some satisfactory way’.” (See, also, 5 N. Y. Jur., Bailment, §§ 59, 74, 78.) (See, also, Diamond v. Foote, supra; Potomac Ins. Co. v. Donovan, 274 App. Div. 666.) This, the defendant has failed to do since, by its own stipulation of facts herein, the defendant admits to no “ further knowledge concerning the circumstances of the disappearance of this automobile from the parking lot.” Having thus failed to afford a reasonable explanation for the missing vehicle which would then shift the burden of proving the actual facts of defendant’s negligence back to the plaintiff, plaintiff’s subrogee becomes entitled to judgment against the defendant, under the doctrine previously set forth by this court in Rosen v. Village Chevrolet (supra).
But, let us go further! Even if defendant could be held to have furnished a reasonable explanation for the missing vehicle, and thereby had sustained its shifting burden of proof, nevertheless, under the facts in this case, the plaintiff has sustained by a fair preponderance of the credible evidence her ultimate burden, and that is to prove the defendant’s negligence. It is clear to this court that the defendant’s negligence is estab *314 lished when it provided a secured, guarded and exclusive place for employees to park their vehicles and then, in effect, allowed anyone else on foot or otherwise to come into Lot No. 7, and drive out with any vehicle, unimpeded and unchecked.
To drive out, one did not have to possess a magnetic coded passcard required of employees to get in. Anyone who possessed sophisticated car-thievery devices — illegal master keys, ignition lock extractors, or ignition wire jumpers — ■ could accomplish this. Defendant was thus negligent in two areas: (a) in failing to provide 24-hour police security service in a place of 24-hour operation, and where there is high car-theft incidence; and (b) in failing to provide, at the exit gate of Lot No. 7, the same control console which would only lift the barring-gate upon the insertion of the same magnetic code passcard required to get into the lot, or otherwise to provide a security agent at the exit to check employees’ credentials.
The defendant owed plaintiff (and her subrogee) the basic duty to prevent that which happened' here. ‘ ‘ A bailee’s general obligation of care requires that he take appropriate measures for the protection and preservation of the property during the term of bailment ” (5 N. Y. Jur., Bailment, §§ 54, 56, 62). The defendant’s negligence was the proximate cause for the loss of plaintiff’s car (5 N. Y. Jur., Bailment, § 58). Accordingly, judgment is granted to the plaintiff’s subrogee in the sum of $700, with interest thereon from June 17, 1970.