NEW YORK STATE ENERGY RE-
SEARCH AND DEVELOPMENT
AUTHORITY, Plaintiff,

v.

NUCLEAR FUEL SERVICES, INC., Getty Oil Company, Commonwealth Edison Company, General Public Utilities Corp., General Public Utilities Service Corporation, Jersey Central Power & Light Co. and Wisconsin Electric Power Company, Defendants.

No. Civ-82-426.

United States District Court,
W.D. New York.

April 8, 1983.

See also, D.C., 97 F.R.D. 709.

958

Philip Gitlen, Albany, N.Y., F. James Kane, Buffalo, N.Y., Carmine J. Clemente, Gen. Counsel, NYSERDA, Albany, N.Y., for plaintiff.

Clarence T. Kipps, Washington, D.C., for NFS.

William I. Shapiro, Buffalo, N.Y., for Getty.

Jack McKay, Washington, D.C., for Com. Edison & Wisc. Elec.

Debevoise & Liberman, New York City, for GPUSC, GPU, Jersey Central.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

This action constitutes another effort by plaintiff New York State Energy Research and Development Authority ("NYSERDA") in this court to facilitate and bring about the correction of conditions hazardous to the public at the nuclear fuels disposal and reprocessing center at West Valley, N.Y. ("the Center"), which NYSERDA owns. Earlier, in an action bearing docket number CIV–81–18 in this Court, NYSERDA sued its tenant and former operator of the Center, Nuclear Fuel Services, Inc. ("NFS"), and NFS's parent, Getty Oil Co. ("Getty"), defendants here also, to bring about the transfer of the Center from NFS to the United States Department of Energy ("the DOE") in order to enable the DOE to implement the West Valley Demonstration Project Act of 1980, Pub.L. 96–368, 94 Stat. 1347. This Act, hereafter referred to as "the federal Project Act," authorized the DOE to carry out a high-level liquid nuclear waste management demonstration project at the Center. After a legal battle re partial summary judgment and injunctive relief requiring NFS to surrender the Center to the DOE, that action and the related suit by NFS against NYSERDA, CIV–81–683, became subject to a settlement agreement dated February 18, 1982, providing *inter alia* for transfer of the Center to the DOE and apportioning liability for allegedly deficient or improper conditions at the Center. That settlement agreement became final with NYSERDA's exercise September 16, 1982 of its option to finalize and an Order of dismissal, based on a November 15, 1982 stipulation requesting the dismissal of both actions. This finalization effectively negated a clause of the Settlement Agreement which otherwise would have imperiled a final settlement if responsibility for all of the spent fuel at the Center would not have been finally determined, by agreement or by litigation, within a certain period of time.

In this action NYSERDA seeks among other things to obtain declaratory, injunctive and monetary relief against NFS, Getty and five public utility companies—GPU Service Corporation ("GPUSC"), Jersey Central Power and Light Company ("Jersey") (sometimes collectively referred to hereafter as "the GPU defendants"), their parent, General Public Utilities Corporation, Commonwealth Edison Company ("Comm. Ed."), and Wisconsin Electric Power Company ("Wisconsin")—alleging their liability for removal of spent nuclear fuel stored at the Center and for pecuniary compensation for storage of such fuel. Relief is sought upon theories of trespass, breach of contract and unjust enrichment.

NYSERDA has moved for partial summary judgment declaring Jersey, Comm. Ed. and Wisconsin the owners of numbers of spent nuclear fuel assemblies and rods containing an aggregate of some 107.4 metric tons of uranium, and declaring the GPU defendants, Comm. Ed. and Wisconsin responsible to NYSERDA for the prompt removal of such spent fuel, on the trespass

and breach of contract theories, and liable to plaintiff under an implied contract for their unjust enrichment from the assertedly improper storage.

The defendants against whom partial summary judgment is sought will hereafter sometimes be referred to collectively as "the utility defendants." NFS and Getty have joined in support of NYSERDA's motion for partial summary judgment.

The utility defendants have cross-moved to strike all or a large part of the affidavit of Carmine J. Clemente, NYSERDA's General Counsel, in support of plaintiff's motion for summary judgment, and the exhibits attached to said affidavit, on the grounds that the affidavit is not, as is required by Fed.R.Civ.P. rule 56(e), based on personal knowledge and that it impermissibly contains inadmissible hearsay and legal argument intertwined with asserted facts. The exhibits are attacked as not having been sworn to or certified as required by the rule and as containing such hearsay. The GPU defendants have also cross-moved for a continuance of NYSERDA's motion in order to permit them to conduct discovery of additional facts with which to oppose NYSERDA's motion.

██ The cross-motion to strike the Clemente affidavit can be quickly disposed of. The deficiencies of the affidavit in regards to Clemente's statement of his personal knowledge of facts set forth and as to the authenticity of the attached documents has been cured by his supplemental affidavit in opposition to the cross-motion, detailing his years of involvement with the events and dealings at and pertaining to the Center. The cross-movants in reply have enumerated those paragraphs and portions of Clemente's original affidavit which were not in their view made acceptable by the supplemental affidavit. To the extent that the basis for their continued exception is that certain paragraphs contain "legal argument or interpretation," the movants'

point is well taken. To remedy this defect it will suffice that I shall endeavor not to mistake such legal advocacy for assertions of fact within the affiant's personal knowledge.[1] *See United States v. Alessi,* 599 F.2d 513, 514–515 (2d Cir.1979); *Perma Research and Development Company v. Singer Company,* 410 F.2d 572, 578–579 (2d Cir. 1969). Other matters as to which Clemente is quite obviously unable to assert personal knowledge—mainly regarding dealings between NFS and the public utility defendants—will be disregarded. However, much or all of such matter is set forth upon personal knowledge in the affidavit of Henry W. Brook, NFS's General Counsel from December 1971 to May 1981, submitted in support of NYSERDA's motion for summary judgment.

In 1963 NYSERDA, which owns the Center in the name of the State of New York, entered into several agreements with NFS pursuant to which NFS constructed facilities for and undertook the enterprise of there reprocessing nuclear fuel wastes. The agreements—a Lease, a Waste Storage Agreement and a Facilities Contract (hereafter referred to collectively as "the West Valley Agreements")—contemplated an initial term ending December 31, 1980.

Pursuant to the Facilities Contract NFS constructed among other facilities a Fuel Receiving Facility, at which spent fuel was received and temporarily stored pending reprocessing. NYSERDA paid NFS for the construction of this facility and was vested with the title thereof upon its completion. The spent fuel in dispute in this action is located in the Fuel Receiving Facility's "storage pool."

In 1963 NFS contracted with the United States Atomic Energy Commission, predecessor of the United States Nuclear Regulatory Commission (both referred to hereinafter as "the NRC") and with several public utility companies, including Comm.Ed., to reprocess spent fuel when the Center be-

---

1. I note that I shall also endeavor to detect and disregard legal arguments and hearsay contained in affidavits submitted by the cross-movants in opposition to NYSERDA's motion— most notably in the voluminous July 7, 1982 affidavit of GPUSC's Vice-President Bernard H. Cherry.

came operational, as it did in May 1966. NFS reprocessed spent fuel at the Center from 1966 until March 1972, when reprocessing was suspended in order to complete an enlargement and modification of the Center's facilities. NFS dismantled portions of the reprocessing plant in preparation for the planned improvements, making it unusable for fuel reprocessing.

In 1972 the NRC instructed NFS to halt its improvements until a construction permit had been obtained, and in October 1973 NFS applied to the NRC for such permit. During this period NFS continued to solicit new reprocessing business and formed agreements with several utility companies, including GPUSC as agent for Jersey (January 10, 1975), Wisconsin (October 16, 1974) and Comm.Ed. (July 3, 1973), to receive spent fuel and store it pending the resumption of reprocessing.

In the course of the ensuing four years or so, the NRC increased regulatory requirements pertinent to NFS's permit application and the permit never was obtained. NFS decided in September 1976 to withdraw from the reprocessing business. The utility defendants were notified of this intent and were invited to discuss the disposition of their fuel then stored at the Center.

On June 23, 1977 NFS and Wisconsin entered into an agreement providing terms for continued storage and eventual removal by Wisconsin of its spent fuel at the Center. Affidavit of Henry W. Brook, Exhibit 1. In the part pertinent to NYSERDA's motion for summary judgment this agreement provides, in paragraph (2)(b) thereof:

> " * * * It is recognized * * * that NFS may have to request the Customer to remove the stored assemblies (a 'request for removal') if regulatory authorizations cannot be maintained or if the New York State Energy Research and Development Authority (NYSERDA) requests NFS to have the stored assemblies removed in connection with NYSERDA's disposition of the site prior to or upon the expiration of the lease between NFS and NYSERDA on December 31, 1980. NFS' request for removal shall specify the date when

removal shall commence which shall be no less than thirty days after the date of the request for removal. NFS agrees to notify the Customer as soon as NFS is notified by NYSERDA with respect to its intention regarding continued storage of spent fuel at West Valley and to keep the Customer periodically informed of any developments which might affect the status of the stored assemblies. The Customer agrees to remove the stored assemblies from West Valley commencing on the date specified in the request for removal. * * * "

The NFS agreement with Wisconsin further provides, in paragraph (2)(c): "Title to the stored assemblies shall remain at all times in [Wisconsin]."

On September 29, 1978 NFS entered into a storage agreement with GPUSC as agent for Jersey, which agreement is in pertinent part substantially identical to that with Wisconsin in the portions of paragraphs (2)(b) and (2)(c) quoted above, but the last above-quoted sentence in (2)(b) continues as follows:

> "subject to the Customer using its best efforts to arrange for a carrier and shipping cask to transfer the stored assemblies and for a licensed storage location to ship them to." Brook Affidavit Exhibit 2.

On November 27, 1978 NFS entered into a storage agreement with Comm.Ed., which agreement in the relevant part differed materially from that between NFS and Wisconsin—chiefly in that NFS promised to use reasonable efforts to arrange for continued storage of Comm.Ed.'s spent fuel with any subsequent operator of the Center, that Comm.Ed. was allowed a minimum of twelve months to remove its spent fuel after commencement of removal and that Comm.Ed.'s agreement to commence removal on the date specified by NFS was made "subject to its obtaining proper governmental authorizations and/or permits." Paragraph (4)(c) of this storage agreement provides, as do the corresponding paragraphs (2)(c) of the agreements with Wisconsin and the GPU defendants, that

"[t]itle to the stored assemblies shall remain at all times" in the utility customer.

On September 21, 1979 NYSERDA notified NFS by letter that NFS was in default of various of its obligations under the West Valley agreements, including the continued storage of spent fuel in the Fuel Receiving Facility without the intention to reprocess such fuel. Clemente Affidavit Exhibit H, pp. 4, 7. NYSERDA informed NFS by letter dated December 19, 1980 of its intention to terminate NFS's lease as of December 30, 1980 unless the defaults specified in the letter should have been remedied by that date, and demanded that NFS remove all spent nuclear fuel stored in the Fuel Receiving Facility "without further delay" (id., Exh. J, p. 3). NYSERDA, believing that the alleged defaults were not being remedied, announced its termination of the NFS lease December 30, 1980. The lease expired by its terms the next day even without the termination.

Thereafter NYSERDA refused to accept surrender of the Center from NFS, insisting on NFS's compliance with terms of the West Valley Agreements relating to the condition of the Center. Under regulatory constraint NFS retained occupancy of the Center during the pendency of the litigation already referred to above, which resulted in settlement and transfer of the Center to the DOE.

On December 8, 1980 Clemente wrote to each of the utility defendants offering to discuss "alternatives to the continued storage of spent fuel at the Center, or the terms and conditions upon which the fuel * * * might continue to be stored at the Center." In response to this invitation, on various dates in January 1981 representatives of each of the utility defendants met with NYSERDA representatives. Each utility defendant avers by affidavit that no demand for removal of the spent fuel was made at these meetings; NYSERDA does not suggest otherwise, but notes that each utility defendant was advised at these meetings that NYSERDA had requested NFS to have all of the spent fuel removed. Clemente Reply Affidavit, ¶ 6.

By letters dated April 7, 1981 NFS informed each of the utility defendants of the circumstances involved in NFS's continued occupancy of the Center despite the lease termination, contending that as of the termination date "NFS had no further contractual rights or obligations with respect to the [Center]." These letters noted that "NFS's legal right to store spent fuel pursuant to the storage agreement[s] terminated on December 31, 1980" and cited the failure of NFS's attempts to negotiate continued storage of the spent fuel. The letters also noted NYSERDA's "seemingly inconsistent position" evidenced by the December 19, 1980 demand that NFS effect removal of the spent fuel and the offers made to the utility defendants to arrange for continued storage; the letters stated that nevertheless NFS was compelled to request the removal of all utility spent fuel stored at the Center, commencing June 1, 1981. Wisconsin and Comm.Ed. replied by letter to the effect that removal of the spent fuel was considered "inappropriate" in view of various difficulties involved and unstated considerations of the "public interest." The GPU defendants did not reply to NFS's April 7, 1981 demand for removal.

On September 30, 1981 the NRC issued an amendment to NFS's and NYSERDA's licenses pertaining to the Center, authorizing NFS to transfer the Center to the DOE.

On October 27, 1981 NYSERDA's Chairman James L. LaRocca sent letters to each of the utility defendants stating NYSERDA's position that NFS's storage of spent fuel at the Center had been improper beginning in 1976 when NFS had announced its withdrawal from the reprocessing business and certainly was improper as of NYSERDA's December 30, 1980 termination of the Lease. The letters noted that the receiving and storage facility was to be used in carrying out the federal demonstration project and that the presence of the spent fuel in the storage pool would result in additional costs to NYSERDA. The letters concluded with demands for prompt removal of all spent fuel and for payment of storage fees (said by defendants to be considerably in

excess of NFS's storage fee under the storage agreements) for the period from the date of the DOE's takeover of the Center (which finally occurred February 25, 1982) through September 30, 1982 or until the spent fuel is removed, whichever occurred first. The removal and payment demands were said to be without prejudice to NYSERDA's right to demand payment for periods before the DOE's entrance onto the Center, or any other claims, defenses or interests of NYSERDA.

Comm.Ed. and Wisconsin replied to LaRocca's letter on November 12th and 23rd, respectively, inquiring as to the terms on which NYSERDA would continue to store their spent fuel and as to the basis of the requested storage fee amount. NYSERDA did not respond to their inquiries. The GPU defendants apparently did not reply to LaRocca's October 27th letter, due perhaps to their having concluded that NYSERDA had no legal right to demand removal of the spent fuel (Cherry Affidavit, ¶¶ 62, 63).

On or about February 10, 1982 NYSERDA asked the GPU defendants to execute an "Acknowledgment of Responsibility" pertaining to the spent fuel, indicating that NYSERDA would defer the removal demand temporarily to permit negotiation of an agreement for continued storage of the spent fuel at the Center. The same request was made of Wisconsin and Comm.Ed. by letters dated March 1, 1982. The letters from LaRocca to the utility defendants stated that early resolution of the status of the spent fuel was important to the DOE's implementation of the federal project. LaRocca's letters to Wisconsin and Comm.Ed. stated also that the acknowledgments would facilitate the negotiation of agreements for continued storage at the Center.

The utility defendants soon complied with LaRocca's request, executing acknowledgments that are in most respects here pertinent substantially identical to one another, providing as follows:

"[The utility defendant] acknowledges responsibility, as between [the utility defendant] and [NYSERDA], for the storage, removal and transportation from [the Center], and ultimate disposition of [the utility defendant's] [spent nuclear fuel] which [is] currently stored at the Center, and for entering into serious bona fide negotiations with [NYSERDA] for the purpose of reaching a definitive agreement with respect thereto; *provided,* that nothing in this Acknowledgment shall diminish or otherwise affect any claims, rights, powers, defenses, or remedies [the utility defendant] may have against any person or entity if such negotiations do not result in a definitive agreement; except, that if such negotiations do not result in a definitive agreement, [the utility defendant] nevertheless acknowledges that it owns such [spent fuel], such [spent fuel] is currently stored at the Center, [the utility defendant] does not have a contract with [NYSERDA] for storage of such [spent fuel], and [NYSERDA] has no responsibility for any loss or damage to or caused by such assemblies or rods or for the continued storage of such [spent fuel] or for the removal, transportation, and ultimate disposition of such [spent fuel]."

Wisconsin's Acknowledgment of Responsibility differs in material aspects from the foregoing only in that it does not explicitly state in the closing "except clause" that Wisconsin owns the spent fuel and that such is stored at the Center; however, the except clause does refer to the spent fuel as "Wisconsin Electric's."

The utility defendants met with NYSERDA to negotiate long-term storage agreements on several occasions subsequent to their execution of the Acknowledgments, but without success.

The utility defendants complain that NYSERDA was intransigent in these negotiations, refusing so much as to provide a basis for NYSERDA's proposed storage charges, and that NYSERDA's institution of this lawsuit May 14, 1982 was not a reasonable deferral of action as NYSERDA had promised in soliciting the Acknowledgments.

The DOE and NYSERDA, pursuant to the Federal Project Act, entered into a Cooperative Agreement October 1, 1980, delineating the rights and responsibilities of the parties respecting the Project and the Center. Section 4.05(d) thereof gives NYSERDA the right "to continue to allow the storage of" the spent fuel in the Fuel Receiving Facility. Further, under section 4.11 NYSERDA is responsible for the costs of the DOE's maintenance of the utility defendants' spent fuel.

Wisconsin and Comm.Ed. aver by their officers' affidavits that they have offered to pay NYSERDA an amount for storage of their respective quantities of spent fuel equal to the DOE's charges therefor plus NYSERDA's additional reasonable charges. The GPU defendants assert that they have at all times been prepared to pay NYSERDA a storage fee "consistent with existing contractual requirements,"—*i.e.*, with their 1978 Storage Agreement with NFS. Cherry Affidavit, ¶ 72.

When the DOE took possession of the Center, pursuant to the NRC's amendment of NFS's operating license NFS lost its rights to use and possess the Center and all of the radioactive materials there stored.

There are well-established standards governing consideration of a motion for summary judgment under Fed.R.Civ.P. rule 56. This rule provides a salutary mechanism for avoiding useless trials and should be so employed when such inutility has been made to appear clearly. "The rule of *Arnstein v. Porter,* 154 F.2d 464, 468 (2 Cir.1946), that summary judgment may not be rendered when there is the 'slightest doubt' as to the facts no longer is good law." *Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir.1972); *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1319 (2d Cir.1975). Thus "the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party. * * *. The litigant opposing summary judgment, therefore, 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). See, also, *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379 (2d Cir.1982). Thus, the pertinent authorities strongly suggest that summary judgment is appropriate where the court is able to conclude that there exists no true dispute as to material facts.

It is nonetheless to be stressed that summary judgment may not be used to resolve actual issues of material fact and that the burden is on the moving party to demonstrate that there is no genuine dispute as to any material fact, the court being obliged to "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman, supra,* at 1320.

These principles fully apply to disputes involving contracts the material terms of which are susceptible to more than one fairly reasonable interpretation; "[t]he parties have a right to present oral testimony or other extrinsic evidence at trial to aid in interpreting a contract whose provisions are not wholly unambiguous." *Ibid.*

As an initial matter there are the defendants' liminal contentions that NYSERDA is equitably estopped or contractually barred from bringing and prosecuting the instant suit by reason of its procurement of an Acknowledgment of Responsibility from each defendant by means of an offer not to sue (to have the spent fuel removed) "for a reasonable time" for the purpose of pursuing a negotiated solution. NYSERDA's protestations to the contrary notwithstanding, its letter to each utility defendant soliciting the latter's officer's signature on the respective acknowledgment is at least fairly susceptible of the defendants' interpretation—to wit, that deferral of litigation for a reasonable time was offered as consideration for the acknowledgment.

■ Defendants have failed to establish an essential element of equitable estoppel—namely, that the party asserting the estoppel had relied *to its injury* upon a representation or action of the party sought to be estopped.

"An estoppel, this court has said, 'rests upon the word or deed of one party upon which another rightfully relies, and, so relying, changes his position to his injury.' * * *. Indeed, 'A party may not, even innocently, mislead an opponent and then claim the benefit of his deception.' * * *. And, more to the point, * * * an estoppel may be predicated upon evidence that the defendant, by resort to settlement negotiations, intended 'to lull the plaintiff into inactivity,' to 'induce it to continue negotiations until after the expiration of the * * * time within which an action' could be maintained. * * *"

*Triple Cities Const. Co. v. Maryland Cas. Co.,* 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 295, 151 N.E.2d 856, 858 (1958).

*Cf., United States v. Bedford Associates,* 491 F.Supp. 851, 866–868 (S.D.N.Y.1980). Defendants suggest that they were injured in reliance upon the offer to defer litigation for a reasonable time in that they executed acknowledgments that, by virtue of the except clauses (which alone purport by their terms to be valid despite the failure of negotiations), now may preclude them from asserting that NYSERDA has any obligation to continue to store the spent fuel at the facility. However, the only basis (other than unsubstantiated appeals to "the public interest") that defendants advance for such an obligation is that NYSERDA has become "successor bailee" to NFS, a claim having no merit. See, *infra.* Defendants point to no other even colorably prejudicial change of position in reliance on NYSERDA's alleged promise to defer litigation for a reasonable time.

■ Moreover, even if the except clause did contain acknowledgements prejudicial to defendants, the latters' remedy would not embrace prevention of the instant lawsuit. The doctrine of equitable estoppel is not usable to gain a positive advantage over the person estopped, but is limited in its effects to measures necessary to place the parties in the same relative positions they would have enjoyed if the grounds for the estoppel had not existed. *Parsons v. Lipe,* 158 Misc. 32, 286 N.Y.S. 60 (S.Ct., Onon. Co., 1933), *aff'd sub nom. Parsons v. First Trust & Deposit Co.,* 243 App. Div. 681, 277 N.Y.S. 426 and 428 (4th Dept. 1935), *aff'd,* 269 N.Y. 630, 200 N.E. 31 (1936). Thus the most that defendants could gain by successful assertion of an estoppel is a preclusion of any use by plaintiff of the acknowledgments.[2] Inasmuch as the contents of the acknowledgments play no role in disposing of the present motions, defendants are not prejudiced by their submission by NYSERDA.

■ The utility defendants' claim that NYSERDA is contractually barred from prosecuting the present lawsuit by reason of its procurement of the acknowledgments of responsibility presents more difficult issues. Section 285 of the *Restatement (Second) of Contracts,* "Contract Not to Sue," provides in pertinent part:

"(1) A contract not to sue is a contract under which the obligee of a duty promises never to sue the obligor or a third person to enforce the duty or not to do so for a limited time.

"(2) * * * [A] contract never to sue discharges the duty and a contract not to sue for a limited time bars an action to enforce the duty during that time."

As noted in Comment (a) to section 285, a contract not to sue is often called a "covenant not to sue"; the Restatement avoided this term so as not to suggest that such a contract must be under seal. Such contracts are also referred to as agreements to forebear. *See, e.g.,* 1 Corbin, *Contracts* 592 (1950). As noted, the language of the letters soliciting defendants' executions of the acknowledgments of responsibility could

---

**2.** The instant demonstration of defendants' estoppel claim's legal insufficiency as a bar to this litigation intimates no conclusion as to the existence *vel non* of other legal or factual inadequacies of such claim.

well lend itself to interpretation as an offer to forebear from suit for a reasonable time, in exchange for the requested acknowledgments. A contract not to sue is disfavored by the law and will be strictly construed against the party asserting it as a bar, requiring clear and explicit language showing an intention to forebear from suit. *E.g., Kaufman v. American Youth Hostels,* 13 Misc.2d 8, 174 N.Y.S.2d 580 (S.Ct., West. Co., 1957), *modified,* 6 A.D.2d 223, 177 N.Y.S.2d 587 (2d Dept.1958), *modified,* 5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 128 (1959). Despite this rule of strict construction, I am unable at present to find as a matter of law that NYSERDA did not oblige itself not to sue on its removal demands for a reasonable period of time. In the context of a contract not to sue, New York's highest court has observed:

"What would be a reasonable time, if not always a question of fact, would at least be a mixed question of law and fact, depending for its solution upon the circumstances of each case." *T.N. Bank v. Parker,* 130 N.Y. 415, 421, 29 N.E. 1094 (1892).

*Cf., Glen Cove Marina, Inc. v. Vessel Little Jennie,* 269 F.Supp. 877, 879 (E.D.N.Y.1967) ("reasonable time" in contract is determined by consideration of "the relationships between the parties, the subject matter of the contract, and the time that a person of ordinary diligence and prudence would use under similar circumstances."). NYSERDA asks that it be found upon this motion that, if contracts not to sue were indeed made, that a "reasonable time" passed from the making of the contracts in February and March 1982 to the filing of this action May 14, 1982, considering the subject matter of this dispute, the conduct of defendants in negotiations and NYSERDA's good faith efforts to negotiate their removal demands. The defendants submit affidavit testimony against NYSERDA's position. A motion for summary judgment is not an appropriate vehicle for the resolution of factual disputes—indeed, all permissible inferences must be drawn in favor of the party against whom such judgment is sought. *Heyman v. Commerce and Industry Insurance Co., su-*

*pra,* 524 F.2d, at 1320. Whether contracts not to sue for a reasonable time were created, whether such quantum of time indeed elapsed between the contracts' creation and the institution of this suit and other pertinent legal and factual issues pertaining to the alleged contracts and the effect to be given them cannot be adequately determined on the record now before me. Inasmuch as the alleged contracts constitute affirmative defenses to NYSERDA's trespass and third-party beneficiary contract claims, both of which seek to advance the removal of the spent fuel from the Center, summary judgment as to such is inappropriate. However, these claims will be analyzed in light of the facts as they appear at this time, and without prejudice to the demonstration of contrary material facts upon competent proof, in order to clarify the issues pertinent thereto.

It is to be noted that nothing in the alleged contracts not to sue refers to any intention to forebear prosecution of NYSERDA's claims against the utility defendants for unjust enrichment, regarding which I have concluded that NYSERDA is entitled to partial summary judgment in its favor.

The utility defendants do not oppose NYSERDA's demand for a declaration that title to and ownership of the spent fuel at issue is in fact in the utility defendants. In its Answer herein each defendant admits to ownership of the spent fuel of the kinds and in the amounts stated in the Amended Complaint and in NYSERDA's moving papers. There being no material issue of fact regarding this demand for relief, summary judgment for NYSERDA concerning the same is in order. Fed.R.Civ.P. rule 56.

*The Trespass Claim*

NYSERDA contends that it is entitled to a declaratory judgment that the utility defendants are, by the continued presence of their spent fuel at the Center, trespassers and as such liable to it for prompt removal of the fuel and for damages. It asserts that this entitlement follows from the undisputed material facts that (1) the utility

defendants own the spent fuel at issue, (2) NYSERDA owns the Center, including the Fuel Receiving Facility, (3) the spent fuel remains at the Center without NYSERDA's permission and in the face of repeated demands for its removal and (4) NYSERDA is not responsible for continued storage of the spent fuel. NYSERDA relies for this result partly upon section 160 of the *Restatement (Second) of Torts* (1965), which provides:

"A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land

(a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated, or

(b) pursuant to a privilege conferred on the actor irrespective of the possessor's consent, if the actor fails to remove it after the privilege has been terminated, by the accomplishment of its purpose or otherwise."

More generally, NYSERDA relies upon the well-established principle that one who lawfully enters upon land but remains thereon after being requested to leave is subject to liability for trespass. *E.g., Rager v. McCloskey;* 305 N.Y. 75, 79, 111 N.E.2d 214 (1953); *Restatement (Second) of Torts,* § 158.

In opposition to this argument defendants raise a plethora of objections, some going to the legal sufficiency of the trespass claim in light of undisputed facts, others to the existence of a dispute over facts material to the claim. Generally, it is urged that NYSERDA lacks an interest in the Center sufficient to confer standing to assert the trespass claim, that the presence of the spent fuel at the Center is pursuant to a bailment and hence cannot be a trespass, that the defendants did not personally place the spent fuel at the Center and hence have not trespassed by its non-removal, that there has been no effective termination of the defendants' authorization to store their fuel at the Center, that the continued presence of the fuel is defensible

as privileged or as a public or private necessity or as unintentional and that NYSERDA's demand for a declaration of liability for "prompt removal" is essentially a request for mandatory equitable relief and as such not resolvable by summary judgment. It is urged that issues of material fact inhere in a number of these contentions, rendering summary judgment unsuitable.

The issue of NYSERDA's standing to assert the trespass claim has been faceted and polished by the opposing briefs as painstakingly as ever any diamond was, with the happy result that from such labor emerges a crystal clear conclusion: NYSERDA as owner of the Center and co-signator of the Cooperative Agreement with the DOE has retained a sufficient interest in its property and is sufficiently injured in that interest by the continued presence of defendants' spent fuel so as to be able to assert that such presence constitutes trespass, absent preclusion by some other legal principle.

Section 4.05(d) of the Cooperative Agreement between NYSERDA and the DOE, as noted, provides that NYSERDA is "entitled to continue to allow the storage of [the spent fuel] presently stored in the Fuel Receiving and Storage Area at the Center pursuant to the provisions of Section 4.11." Under section 4.11, the DOE will maintain and surveyal the spent fuel at NYSERDA's expense.

Defendants rely upon the general rule that only a party in possession of real property may sue for a trespass thereto (*e.g., Steinfeld v. Morris,* 258 A.D. 228, 16 N.Y. S.2d 155 (1st Dept.1939)), and that ownership alone does not suffice to confer standing in trespass (*e.g., Kelman v. Wilen,* 283 A.D. 1113, 131 N.Y.S.2d 679 (2d Dept.1954)). However, ownership will suffice to confer standing if the owner is personally injured by the trespass.

In *Kernochan v. N.Y.E.R.R. Co. et al.,* 128 N.Y. 559, 29 N.E. 65 (1891), a landowner was held able to maintain a trespass action for damages for impairment by defendants' elevated railroad of easements in the street appurtenant to his premises, notwithstanding that he was not in possession of his

premises, which had been leased for a term of years. The court rightly declined to be misled by the mere denomination of the wrong as a trespass into concluding that the "injury [was] to the immediate occupier of the land, viz., to the tenant rather than to the landlord." *Id.,* at 563, 29 N.E. 65. It was found that the circumstances which obtained at the time the lease was made—namely, the then-existence of the elevated road—required the conclusion that the lessee's rental payments were lower by the amount attributable to the effect of the railroad on the value of the property than they would have been absent the railroad; hence the injury by the trespass was to the lessor. The owner was thus held entitled to damages, for "[h]e has been compelled to accept smaller compensation for the use of his property than he otherwise would have received, and to that extent has been deprived of its beneficial enjoyment." *Id.,* at 566, 29 N.E. 65. Contrary to defendants' contention, *Kernochan* is not distinguishable from the instant case as an action in which only money damages were sought or appropriate. The only reason the plaintiff in *Kernochan* was unable to compel removal of the trespassing structure was that defendants could at any time have exercised the right of condemnation (*ibid.*), a power the present defendants may covet but do not possess.

Defendants argue that NYSERDA is not suffering any injury from the presence of the spent fuel at the Center because defendants have consistently been prepared to make NYSERDA "whole" by paying it an amount which the defendants deem adequate to that end. It is urged that such injury is, under *Kernochan,* an essential element of a trespass claim by one not in actual possession of real property.

■ Assuming but not conceding[3] the correctness of defendants' statement of the

law on this point, their argument that NYSERDA is experiencing no injury from the presence of the spent fuel is not well taken. For one thing, each utility defendant has maintained that it is prepared to give NYSERDA a *different* measure of compensation for the spent fuel's storage—to wit, the DOE's charges plus NYSERDA's administrative costs (Comm.Ed.), the DOE's charges plus a negotiated additional fee (Wisconsin) and a fee based on the 1978 storage agreement with NFS (the GPU defendants). Which, if any, of these measures of compensation would make NYSERDA "whole"?

If any further evidence of actual injury were desired, it suffices to observe that defendants would have NYSERDA continue to store defendants' property for a fee dictated by themselves rather than by NYSERDA or by the market for similar storage. Even governmental condemnations cannot be permitted without the payment of just compensation, which "includes all elements of value that inhere in the property, [limited by] market value fairly determined." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). NYSERDA, as owner of the Center and retainer of the right to store defendants' spent fuel there, has the inherent right to store such fuel upon terms agreeable to it; defendants' continued denial of that right certainly constitutes sufficient actual injury to NYSERDA to confer standing to assert a trespass by defendants, should such be required by law.

■ The preceding paragraph addresses and sufficiently refutes any apparent anomaly involved in holding that retention of a right to *store* items upon an owner's premises confers standing to demand the *removal* of such items. The latter right is necessary to the effectuation of the former right and of the other rights implicit in the for-

---

**3.** In my view, under *Kernochan* the inquiry as to which party suffers the injury, lessor or lessee, owner or possessor, is relevant only to determining who shall be allowed to assert the trespass. Even in the absence of some actual injury to the party thus determined to have standing, the law will apply the time-honored rule that nominal damages will be awarded against the trespasser (*see, e.g.,* Prosser, *Law of Torts* 66–67 (4th ed. 1971)) and that injunctive relief if otherwise appropriate will be available purely to vindicate the possessor's interest in the property.

mer right. The very explicitness of the retention of NYSERDA's right to store these spent fuel wastes at the Center further bolsters the conclusion that NYSERDA has retained the right to control all the conditions of such storage and to terminate the same if NYSERDA so desires and is otherwise legally able to do so.

Defendants urge that *Kernochan* be read narrowly to grant a right of action in trespass to an owner not in possession only where there is some permanent damage being done to the owner's reversionary interest.[4] However, *Kernochan* clearly emphasized the importance of the injury to the owner's rents even while out of possession and must be regarded as applying the more general proposition that a trespassory injury to property, if falling upon the owner and if substantial and not merely passing, will support an action in trespass by the owner against the wrongdoer even though the owner does not have possession of the property.

If an injury to NYSERDA's reversion *were* required for maintenance of the trespass claim, such could be found readily enough in that, if the spent fuel at issue is not removed from the Center in the meantime, it will still be there when, years hence, NYSERDA retakes possession upon completion of the DOE's role in the demonstration project. Such presence would constitute a trespassory injury to the reversion redressable by an action which under *Kernochan* is unified with NYSERDA's claim for a present trespassory injury to its continued possessory rights in the Center. The defendants urge that no trespass against or injury to NYSERDA's reversionary interest is threatened because they will remove

their spent fuel if and when the DOE informs them that such is necessary for the progress of the demonstration project. Such gratuitous promises cannot suffice to defeat a reversioner's right to assure himself or herself or itself that an injury to the reversion will not occur, by suing for cure of the trespass at the time it becomes apparent that such is more than a "mere[ly] temporary or casual trespas[s] on the land" (*Kernochan, supra,* 128 N.Y., at 566, 29 N.E. 65) and is likely to ripen into a trespass against the owner's possession when reversion occurs. A contrary rule would effectively nullify the reversioner's right to sue for injury to the reversion notwithstanding any intervening estate for years, in New York a statutory right, for the wrongdoer could most always plead as a perfect defense that the injury would be cured before the reversion occurs.

Finally, *Kernochan* does not require that the allocation of standing to sue to either the lessor or lessee must be determined only upon trial, as defendants contend. Rather, the court found that the lessor's interest had been invaded merely by the fact that the trespassing railroad structure was in place when the lease was made, clearly a matter determinable upon a motion for summary judgment. Here the terms of the Cooperative Agreement regarding NYSERDA's continued right to store spent fuel at the Center are sufficiently proven and clear to support NYSERDA's claim without need for further evidentiary development. Nothing suggested by defendants or appearing in the record points to any contrary conclusion.[5]

Further authority for holding that the reservation of the right to store the utility

---

4. In New York a reversioner has a statutory right to "maintain an action founded upon an injury done to the inheritance, notwithstanding any intervening estate for life or for years." New York's Real Property Actions and Proceedings Law § 831.

5. In support of the defendants' motion for a continuance, attorney Mark Augenblick, in a Supplemental Affidavit, asserts the need for discovery pertaining, *inter alia,* to NYSERDA's exercise of its rights of entry and possession under the Cooperative Agreement, to NYSER-

DA's and the DOE's intent regarding the provision of such agreement entitling NYSERDA to continue to store the spent fuel at the Center, to the DOE's and NYSERDA's expectations regarding the spent fuel and to the implementation of the provision for continued storage by NYSERDA. In connection with NYSERDA's trespass claim, these matters are of doubtful legal relevance to the effect to be given to the provision for continued storage, which provision is facially clear and unambiguous.

defendants' spent fuel in the receiving facility constitutes a sufficient reserved interest in the Center to give NYSERDA standing to assert a trespass claim is found in several other decisions cited by the parties, one of them a New York appellate decision, *Frost v. Duncan,* 19 Barb. 560 (Kings Co.Gen. Term 1855), observing, at 560–561:

"At common law there was no right of action, for injuries to land, by an owner out of possession. If he had partially parted with the possession, and reserved some possessory rights, he could then sustain an action for their invasion."

In accord with this observation is the decision in *Alabama Fuel & Iron Co. v. Courson,* 212 Ala. 573, 103 So. 667 (1925), holding that, where a lease reserved to the lessor the right to exclude others than its tenant and his family from use of a way of ingress and egress provided for such tenant, the lessor could sue in trespass one making unauthorized use of the way. To similar effect is *Harris v. Keystone Coal & Coke Co.,* 255 Pa. 372, 100 Atl. 130 (1917).

■ Defendants make much of language in the Cooperative Agreement to the effect that the DOE shall have "exclusive use and possession" of the Center during the term of the demonstration project. However, section 4.05 of the Cooperative Agreement, paragraph (d) of which entitles NYSERDA to continue to allow the spent fuel to be stored in the receiving facility, begins: "Anything to the contrary herein notwithstanding, [NYSERDA] shall without charge * * *". This language obviously suspends or derogates the application of the grant of exclusive use and possession to the DOE. Surely, if the DOE attempted to sue the utility defendants in trespass for the continued presence of their spent fuel at the Center, defendants would not hesitate to offer section 4.05(d), and section 4.11(a)(ii)'s allocation of costs to NYSERDA for the DOE's management of the fuel as NYSERDA's agent, as evidence of the DOE's lack of standing to assert such a claim—and with much greater reason than is found in their arguments that NYSERDA lacks standing. Justice requires that NYSERDA's retained interest in the Fuel Receiving Facility be regarded in law as adequate for standing purposes in trespass.

■ The foregoing resolution of the standing issue obviates exploration of NYSERDA's other arguments and defendants' replies regarding this point. It is to be noted however that NYSERDA has shown no interest in the Center sufficient to support a trespass claim for the period *prior to* the DOE's February 25, 1982 takeover. It is a matter of record that NYSERDA refused to accept surrender of possession of the Center from NFS under the West Valley Agreements from the termination of NFS's lease at the end of 1980 through the date of the settlement of the prior litigation between NFS and others and NYSERDA, pursuant to which the DOE took possession of the Center. In the circumstances obtaining in the period of NFS's "holdover" tenancy after 1980 and to February 25, 1982 NYSERDA was unable to exercise any possessory interests in the Center and hence as a matter of law cannot claim that the utility defendants trespassed by failing to remove their spent fuel during that period. Although NYSERDA did, in *NYSERDA v. NFS and Getty Oil Co., supra,* seek to assert the right to possession of the Center as against NFS in order to compel NFS to turn the Center over to the DOE, I decline to bring the subtleties of the arguments surrounding NYSERDA's possessory right, claimed in that lawsuit, to bear upon the instant trespass claim against the utility defendants; any otherwise possible purpose of doing so is negated by my conclusion, stated hereafter, that NYSERDA apparently has not yet made an unequivocal demand for the removal of the spent fuel and for that reason cannot succeed on its trespass claim.

Defendants contend that, under Comment (n) to section 160 of the *Restatement (Second) of Torts,* the continued presence of their spent fuel at the Center cannot be a trespass because it was originally placed there pursuant to a bailment and that NYSERDA has become "successor bailee" to NFS, the original bailee. Comment (n) provides in pertinent part:

"If a chattel belonging to the actor which is on land in the possession of another has been bailed to the other by the actor * *, the actor's failure to remove the chattel from the bailee's land is not a trespass, even though at the time of the bailment it was agreed that the bailment was to be terminated and the chattel retaken by the bailor at a given time or at the bailee's request."

■ Defendants' contention that the spent fuel's deposit at the Center was when made in the nature of a bailment is tenable.[6] However, such bailment to NFS necessarily terminated, either by breach of contract or due to impossibility of performance, when NFS relinquished control over the spent fuel. *See, e.g., Bentley v. Textile Banking Company,* 26 A.D.2d 112, 271 N.Y. S.2d 417 (1st Dept.1966).[7] Defendants' attempt to read Comment (n) as applying *whenever* chattels have been left on land pursuant to a bailment is unconvincing. The language of the comment clearly shows an intention to clarify the relationship between bailor and bailee; only if NYSERDA could be held to have assumed the relationship of bailee to the utility defendants might Comment (n) apply to defeat NYSERDA's trespass claim.

Defendants rely in part upon the rule stated in *Seaboard Sand & Gravel Corp. v. Moran Towing Corp.,* 154 F.2d 399, 402 (2d Cir.1946):

"The relation [of bailment] may be created by operation of law. It is the element of lawful possession, and the duty to account for the thing as the property of another, that creates the bailment, whether such possession results from contract or is otherwise lawfully obtained. It makes no difference whether the thing be intrusted to a person by the owner or by another. Taking lawful possession without present intent to appropriate creates a bailment."

It is urged that, either by seeking to enforce defendants' storage agreements with NFS as a third-party beneficiary or by assuming custody and control over the spent fuel by arranging for its continued storage, NYSERDA assumed NFS's bailee status regarding the fuel. The first proposition, regarding NYSERDA's effort to enforce the 1978 storage agreements, has not been supported by citation of authority and does not recommend itself as either logical or just and will therefore not be further analyzed.

■ In opposing the argument that, by assuming custody and control over the spent fuel it became NFS's successor and defendants' bailee, NYSERDA relies upon the principle that the status of bailee must be voluntarily assumed and cannot be thrust upon an unconsenting person. This is an accurate statement of the law. Every case cited by defendants as holding that assumption of control over the property of another establishes a bailment—and the cases cited as authority in those cases—involved the element of voluntariness in such assumption of control. *Weinstein v. Modern Silk Co.,* 170 N.Y.S. 529 (App.Term, 1st Dept., 1918), by contrast, held that, when a

---

**6.** NYSERDA's argument that the nature of the bailment relationship is such that an agreement to store valueless refuse or waste can never constitute a bailment is not persuasive. It is true that, where the bailed chattel is of negative value, the bailee's lien (New York's U.C.C. § 7–209) becomes meaningless as a means of protection against breach. However, NYSERDA has not adequately proven the complete absence of value in the spent fuel involved here; I am unwilling to presume such from the mere fact that defendants are not anxious to retrieve their spent fuel—a fact which is probative but not dispositive of the issue.

**7.** Had the storage of the spent fuel by NFS been pursuant to a mere license as NYSERDA contends, such license terminated when NFS lost possession of the Center. *Restatement (Second) of Torts,* §§ 160, Comment (a); 171.

These holdings are without reflection upon the possibility that the contracts for storage of the spent fuel at the Center, whatever their nature, may have terminated at an earlier time, such as when NFS's lease expired in December 1980. Although the storage agreements recited a term ending in 1989, as a general rule every legal interest that a lessee grants in the leased premises must terminate with the lease. *E.g., New York Rys. Corporation v. Savoy Associates,* 239 App.Div. 504, 268 N.Y.S. 181 (1st Dept.1933).

dissatisfied customer had left previously purchased goods on the defendant vendor's premises without defendant's consent, and defendant subsequently placed the goods in the public corridor outside its door, the defendant had not been made plaintiff's bailee and was thus not liable for the loss of some of the goods while they lay in the corridor. Recognizing that voluntary assumption of control over the goods of another creates "some relation of bailment," the court observed: "Defendant could not, without its consent, in fact, in face of its active protest, be made bailee of plaintiff's goods by force." 170 N.Y.S., at 529. *See, also, Peralta v. Port of New York Authority,* 68 Misc.2d 302, 326 N.Y.S.2d 776, 781 (Civ.Ct., Queens Co., 1971).

■ The question then is whether NYSERDA's arrangement for continued maintenance of defendants' spent fuel was such a voluntary assumption of control as to constitute acceptance by it of the role of bailee. Obviously the mere failure to succeed in having defendants remove or commence the removal of the spent fuel prior to the DOE's takeover does not supply the element of voluntary assumption any more than did in *Weinstein v. Modern Silk Co., supra,* the failure of that defendant to have the plaintiff therein remove his purchased goods from such defendant's premises constitute acceptance of a bailment. It is true that prior to October 1981 NYSERDA's position regarding continued storage of the spent fuel at the Center was somewhat ambiguous; while requiring NFS to demand its removal, NYSERDA was apparently also offering to the utility defendants the opportunity to continue the storage at the Center. However, in October 1981 NYSERDA's chairman unequivocally demanded that each utility defendant remove its spent fuel, putting them on notice that it did not intend to assume NFS's storage duties. Neither NYSERDA nor the DOE was able after NFS vacated the Center to simply remove the spent fuel and place it in the public corridor, so to speak, due to governmental regulatory constraints and the danger inherent in doing so; this failure to remove defendants' chattels was under constraint and is not evidence of a voluntary assumption of control.

■ Around the time of the DOE's takeover of the Center, NYSERDA communicated to each of the utility defendants its willingness to "defer [its] demand for removal" in order to reach negotiated terms for continued storage. It is clear from the tenor and wording of these communications that NYSERDA was not willing to act as the utility defendants' warehouser or bailee in the absence of agreement. The utility defendants have suggested or pointed to nothing in NYSERDA's conduct that reasonably tends to show a voluntary assumption by NYSERDA of the status of bailee. Thus as a matter of law it must be held on the instant motion for summary judgment that the bailment exception to the rule that refusal to remove one's chattels from the land of another constitutes trespass does not obtain in the instant case.[8]

Alternatively, if there were a question of fact regarding NYSERDA's assumption *vel non* of bailee status, I would hold that under the circumstances of this case the bailment exception stated in Comment (n) of section 160 of the *Restatement (Second) of Torts* may not be applied to defeat NYSERDA's trespass claim. The scope of the bailment exception has apparently been little explored by the courts; indeed, the par-

---

**8.** This analysis of course relates to whether NYSERDA should be held to be party to a bailment "implied in fact," rather than "implied in law." A bailment is implied in law when under the circumstances justice requires that the acquirer of property belonging to another be subjected to the duty of preserving the property for restoration to its owner, without regard to voluntariness or any meeting of minds or other element of contract. *See, e.g., Foulke v. New York Consol. R. Co.,* 228 N.Y. 269, 127 N.E. 237 (1920). Inasmuch as federal and state regulatory measures are adequate to impose the duty of preservation upon NYSERDA, there is no need to apply an implied-in-law bailment to the situation. Thus I need not consider whether such a bailment would otherwise obtain here, or indeed whether the bailment exception of Comment (n) should itself apply where the bailment is merely one implied in law.

ties admit to inability to discover even one case applying the exception and I similarly have been unable to exhume any. As justification for the exception defendants recite the observation of the American Law Institute's Tentative Draft No. 7 for section 1005 of the first *Restatement of Torts* (comment 1, notes) to the effect that failure to remove a bailed chattel from the bailee's land is not a trespass inasmuch as "the actor's duty to remove the chattel arises solely from the contract of bailment." In the instant case there is no negotiated contract and hence no stated terms for removal or return of the spent fuel that may be enforced against defendants. If a contract exists it is terminable by either party at will (*Howes v. Peckham Road Corp.*, 14 A.D.2d 940, 221 N.Y.S.2d 221 (3d Dept. 1961); *E.P. Dutton & Co. v. Isaac Goldmann Co.*, 277 A.D. 556, 101 N.Y.S.2d 379 (1st Dept.1950)) and, according to defendants, upon termination plaintiff's only remedy for the undesired presence on its land is to remove the spent fuel to another storage area and charge defendants for the expenses of removal and continued storage. However, defendants contend elsewhere, principally in urging that necessity justifies their refusal to remove their spent fuel from the Center, that there exists no place where the spent fuel may be stored other than their own storage facilities, connected with each utility defendant's own nuclear power generating plant or plants. It is clear that NYSERDA cannot unilaterally return the spent fuel to defendants' respective facilities. Thus, under defendants' bailment defense theory, NYSERDA would have no remedy at all, unless this court were to enjoin defendants to accept it at their own respective facilities, the very thing sought to be avoided by defendants' vigorous defense against the trespass claim (or unless NYSERDA may enforce the storage agreements' removal provisions as a third-party beneficiary thereof, which defendants also vigorously oppose).

Defendants' requests for a continuance are supported in part by assertions that discovery is needed to determine the understanding between NFS and NYSERDA regarding the fixing of responsibility for the spent fuel stored at the Center when NFS was to have vacated the Center. We are not dealing here with mere baggage that NFS could have packed along when it left the Center, or even large chattels or fixtures that NFS could have removed only at great difficulty. NFS could not remove the spent fuel; under federal and state laws for the protection of the public, whoever or whatever entity received use or care or possession of the spent fuel storage pool from NFS was obligated to be responsible for the spent fuel stored therein. Defendants have not ventured so far as to suggest that NYSERDA had a business interest in assuming responsibility for the spent fuel; any understanding between NYSERDA and NFS regarding the former's assumption of responsibility for the fuel wastes, if such existed, patently was dictated by the law and the public interest, which decisively militates against predicating defendants' successor-bailee defense upon such understanding.

The circumstances of this case are too far removed from the ordinary bailment situation, due to the manner of formation of the bailment relation (if any), the lack of terms of the putative bailment and the special difficulties appurtenant to the subject of the putative bailment, for the application of Comment (n) of the *Restatement (Second) of Torts,* § 160.

Defendants further urge that their spent fuel's presence at the Center cannot be a trespass because they did not personally place it there, which act is said to be an essential element of the claim of trespass founded on a failure to remove chattels from another's land. This defense is entirely insubstantial. It is established that defendants agreed with NFS for NFS's transportation of their spent fuel to the Center and paid NFS substantial sums for such transportation. This obviously equates to placement of the spent fuel at the Center by defendants themselves.

Defendants ongoingly argue that they lack the intention to commit a

trespass and that such intention is a required element of this tort. However, no specific intent is required for the commission of a trespass. A trespasser, to be such, need not intend harm to or unlawful interference with the other's property and may in good faith believe that he or she or it is in some way entitled to enter or remain upon the property. *See, e.g., Phillips v. Sun Oil Co.,* 307 N.Y. 328, 121 N.E.2d 249 (1954); *Serota v. M&M Utilities, Inc.,* 55 Misc.2d 286, 285 N.Y.S.2d 121 (Nassau Co.Dist.Ct. 1967). In the case of trespass through the continuing presence of chattels on another's land, the requisite intent does not arise until the duty to remove the chattels arises, which does not occur until a demand for removal has been made. *See, e.g., Rager v. McCloskey, supra,* 305 N.Y., at 79, 111 N.E.2d 214; *Rosenstiel v. Rosenstiel,* 20 A.D.2d 71, 245 N.Y.S.2d 395, 400–401 (1st Dept.1963); *Restatement (Second) of Torts,* §§ 158, 160. *Cf., New York's Real Property Actions and Proceedings Law* § 715.7(b). Hence defendants lack the intent required for the trespass charged unless and until an unequivocal demand for removal shall have been made. This NYSERDA has not proven itself to have done.

■ To establish that it has demanded the removal of the utility defendants' spent fuel, NYSERDA relies upon its demands of NFS that it cause the fuel to be removed, upon communications with defendants prior to October 1981 indicating NYSERDA's position that their authorization for storage of the spent fuel had lapsed and that agreement must be reached if storage at the Center was to continue and, principally, upon the October 27, 1981 letter of LaRocca demanding removal of the spent fuel without an offer of continued storage upon new terms. All of these actions suffer as demands for removal for trespass purposes from the same defect—to wit, that they were made at a time when NYSERDA was not in possession of the Center. Moreover, the pre-October 1981 actions were equivocal at best, were tantamount to an offer to continue storage and thus licensed the continued presence of the spent fuel at the Center pending agreement on storage terms. The October 1981 removal demand was unequivocal (notwithstanding the simultaneous demand for payment for continued storage, obviously made in recognition that removal would require some time), but this demand was in effect rescinded at the time of the DOE's takeover, when NYSERDA gained standing to assert defendants' trespass. At that time NYSERDA stated a willingness to defer its demand for removal in order to permit negotiations for continued storage and such negotiations were conducted up to and for some time after the filing of this lawsuit. The inevitable effect of this conduct by NYSERDA was to create a license—not to say a free license—for the spent fuel's continued storage until such license should be revoked by NYSERDA. No such revocation has been hinted at, much less proven, to the negation of NYSERDA's claim of trespass. Should NYSERDA amend its Complaint to allege that such a subsequent unequivocal removal demand has been made, the trespass claim will be made colorable, which circumstances warrant the examination at this point of defendants' remaining defenses to the claim.

■ Defendants contend that the continued presence of their spent fuel at the Center is justified by either public or private necessity and is therefore not a trespass. Section 196 of the *Restatement (Second) of Torts* states the "public necessity" justification for unauthorized entry onto the land of another:

"One is privileged to enter land in the possession of another if it is, or if the actor reasonably believes it to be, necessary for the purpose of averting an imminent public disaster."

The public disasters that defendants point to as necessarily consequent to their removal of their spent fuel from the Center are that the productive lives of their nuclear reactors would probably be shortened by the storage of the spent fuel in the facilities at their reactor sites, unless such facilities are enlarged or new facilities are built, and that there exists some risk to the public

from the transportation of the spent fuel. The expenses to defendants and to their customers of moving the fuel, and moving it again if a new storage facility is afterwards constructed, and of their reactors' diminished life-span if no new storage is found, are also cited as justifying defendants' refusal to remove their fuel wastes.

Defendants have not contended either that their nuclear reactors would have to be shut down in the very near future if they retrieve their spent fuel or that such shutdowns, when and if they occur, would occasion a loss of vital electrical power to some or all of their customers. None of the defendants urges that there is any considerable risk involved in transporting the spent nuclear fuel—whatever risk there may be, it is one that defendants were willing to incur at the time they paid NFS to transport the spent fuel to the Center. Defendants have not pointed to a single disastrous incident in the history of the transportation of spent nuclear fuel. The likelihood of mere monetary expense is not an "imminent public disaster" within the scope of the public necessity privilege.

Defendants urge that the reasonableness of their belief that their refusal to remove the spent fuel was justified by public necessity is a question of material fact precluding summary judgment. This contention is effectively mooted by my denial of summary judgment on NYSERDA's trespass claim, but merits examination nonetheless. Judging their purported belief in the context of a correct understanding of the allegedly protective rule—that only a true "imminent public disaster" will support a defense of privilege based on public necessity—it is necessary to conclude as a matter of law that no reasonable person could believe that any of the consequences that defendants seek to avoid by leaving their spent fuel at the Center rise to the level of imminent public disaster within the plain significance of those words.

The elements of the defense of privilege based upon private necessity are set forth in section 197(1) of the Second Restatement as follows:

"One is privileged to enter or remain on land in the possession of another if it is or reasonably appears to be necessary to prevent serious harm to

(a) the actor, or his land or chattels, or

(b) the other or a third person, or the land or chattels of either, unless the actor knows or has reason to know that the one for whose benefit he enters is unwilling that he shall take such action."

The private harm in terms of monetary loss and lost reactor life that defendants cite quite arguably comes within the plain language of subparagraph (a). However, the rule's language as stated in section 197(1) is not adequate to define the scope of the privilege of private necessity.

Defendants' effort to apply this rule to their conduct well illustrates the observation of Dean Prosser, the American Law Institute's Reporter for the *Restatement (Second) of Torts,* that the use of the term "necessary" in the above formulation "is unfortunate, since it is broad enough to apply to any situation where it obviously is desirable to do something to avoid unpleasant consequences." Prosser, *Law of Torts* 124–125 (4th ed. 1971). A proper understanding of the defense of necessity recognizes the need for an element of emergency in both the public and private necessity components of the privilege. Regarding the private necessity defense, Prosser notes that "[m]ere convenience or advantage is not sufficient, in the absence of real emergency," citing a number of illustrative cases. *Law of Torts, supra,* at 126 n. 6. Thus Comment (a) of section 197 of the *Restatement (Second) of Torts* provides:

"The privilege [of private necessity] exists only where *in an emergency* the actor enters land for the purpose of protecting himself or the possessor of the land or a third person or the land or chattels of any such persons." (Emphasis added.)

Defendants have noted no emergency, public or private, requiring that their spent fuel remain at the Center. Monetary expense and the possible future early retirement of their nuclear reactors cannot alone constitute such an emergency. Defendants have

stated no basis that might conceivably support a reasonable belief that private necessity justifies their refusal to remove their spent fuel.

### Propriety of a declaration of liability to promptly remove the spent fuel

Defendants urge that there are issues of material facts pertaining to NYSERDA's demand for a declaration that defendants are liable to NYSERDA for the prompt removal of their spent fuel wastes from the Center. Specifically, defendants contend that various facts pertaining to the justification *vel non* of equitable relief are disputed—to wit, whether money damages are available and adequate, whether NYSERDA will suffer irreparable harm if defendants' continuing trespass is not enjoined, any detriment to defendants to be expected from a grant of injunctive relief and the interest of the public in the continued storage of defendants' wastes at the Center. The examination of the authorities cited by defendants and the arguments drawn from such authorities compels the conclusion that there has not been shown to exist any colorable dispute regarding facts material to the equities attending NYSERDA's request for a declaration of defendants' liability in trespass for the removal of their fuel from the Center. The inclusion of the word "prompt" in NYSERDA's request for relief is deemed to be without any significance; if defendants are eventually ordered to remove their wastes from the Center, such removal will of course be required to be effected as promptly as prudence and the attendant circumstances will allow.

In view of the continuing nature of the trespass and the unsuitability of any other mode of relief to afford NYSERDA adequate protection for both its present interest in its property and its reversion, an injunction requiring defendants to remove their spent fuel would be appropriate. *See, e.g., Sadlier v. City of New York,* 185 N.Y. 408, 413, 78 N.E. 272 (1906); *Garvey v. Long Island R.R. Co.,* 159 N.Y. 323, 332, 54 N.E. 57 (1899); *Wheelock v. Noonan,* 108 N.Y. 179, 186, 15 N.E. 67 (1888); *Board of Higher Education v. Students for Dem.*

*Soc.,* 60 Misc.2d 114, 300 N.Y.S.2d 983 (S.Ct., Queens Co., 1969); 1 High, *Law of Injunctions,* §§ 697, 700, 702, 713, 722b. Such injunctive relief admittedly might not be appropriate if the effect would be to " 'produce great public or private mischief merely for the purpose of protecting a technical or unsubstantial right' " (*Garvey v. Long Island R.R. Co., supra,* 159 N.Y., at 333, 54 N.E. 57). However, in this case the right sought to be asserted is substantial; it is undisputed that by anyone's measure the reasonable value of the storage of defendants' spent fuel sounds in the hundreds of thousands of dollars yearly. The right is not merely technical, but is close to the very heart of the concept of individual ownership of property, of which " '[a]n essential element * * * is the legal right to exclude others from enjoying it.' " *Kaiser Aetna v. United States,* 444 U.S. 164, 180, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 n. 11 (1979).

Defendants argue that NYSERDA would be willing to permit them to continue to store their fuel wastes at the Center if defendants were willing to pay NYSERDA's "exorbitant" asking price for such storage and that NYSERDA has no right to turn to the courts to obtain "leverage" in this "primarily commercial" dispute. It is a fundament of our society that recourse to law is available for protection of commercial as well as individual rights. If defendants find themselves in a bad bargaining position, that situation cannot be improved by the sort of judicial abstention that they have urged here but would no doubt speedily denounce were a similar contention ever raised against their own interests.

Defendants are also wrong in claiming as they do that their various offers of payment to NYSERDA offset the latter's damages, raising an issue of fact for trial as to whether NYSERDA is damaged in any substantial amount after the amounts of their offers are considered, and hence as to the propriety of injunctive relief. Such offers are in the nature of settlement proposals only; NYSERDA is not bound to accept them and they have no bearing upon the amount of its damages.

The propriety of injunctive relief in this case is shown by a comparison of its essential features with the facts of *McCann v. Chasm Power Co.,* 211 N.Y. 301, 105 N.E. 416 (1914), and *Wheelock v. Noonan, supra.* In *McCann,* in which defendants seek comfort, the court recognized that the flooding of those plaintiffs' land due to those defendants' dam was a continuing trespass entitling such plaintiffs "to resort to equity for the purpose of enjoining its continuance and to thus prevent a multiplicity of actions at law to recover damages." 211 N.Y. at 304, 105 N.E. 416. However, it was found that such plaintiffs had participated in the construction of the dam and had "bought the lands with complete knowledge that the continuing trespass was upon them and of its cause and extent," and that they had sustained no damage and no interference with their present or contemplated use of their flooded lands, which consisted of valueless, barren perpendicular rock cliffs. Those defendants by contrast had invested a large sum in the construction of the dam and were providing a valuable service to the public by the generation of electricity. Certainly the instant defendants do not and cannot claim the existence of facts providing a balance of equities in their favor comparable to that in *McCann.*

The instant case is factually much closer to *Wheelock v. Noonan, supra,* in which the defendant therein had, under license, piled up stones upon that plaintiff's property and had refused to remove them when the license terminated. In *Wheelock* the defendant urged, much as do defendants here, that the plaintiff's remedy for the unwanted presence on his land was to remove the rocks to another location and charge the defendant with the attendant expenses or, alternatively, to be satisfied with money damages recovered in successive suits at law for the continuing trespass. The Court responded to the first argument that "any adjudication * * * throwing such burden upon the owner, compelling him to do in advance for the trespasser what the latter is bound to do," would be of very dubious authority. 108 N.Y., at 184–185, 15 N.E. 67. To the second argument the response was

simply that "[t]he wrong in every such case is a continued unlawful occupation and any remedy which does not or may not end it, is not adequate to redress the injury, or restore the injured party to his rights." 108 N.Y., at 185. These remarks of New York's Court of Appeals strongly recommend themselves for application to the instant defendants' arguments.

No help is found for defendants' position in *Miceli v. Riley,* 79 A.D.2d 165, 436 N.Y. S.2d 72 (2d Dept.1981), which defendants erroneously characterize as holding in effect that, in ejectment actions brought under section 601 of New York's Real Property Actions and Proceedings Law, a court is free to deny the statutory remedy of ejectment and to fashion an appropriate equitable remedy when the landowner knew or had reason to know of the occurrence of the conduct at its inception but delayed taking action against the actors. Under *Miceli,* defendants argue, NYSERDA's right to the customary remedy of injunction against trespass must be subjected to the usual equitable balancing considerations because NYSERDA knew of the placement of the spent fuel at the Center when it was done, but took no action to protect its interests until recently.

Assuming its relevance, the *Miceli* case is not so nicely tailored to defendants' needs. In *Miceli* it was observed that, while a defendant in an ejectment proceeding at law could interpose equitable defenses,

> "in each case in which the court has chosen to fashion an equitable remedy rather than to award the plaintiff unconditional possession of the property, there has been a finding that the plaintiff himself had engaged in some inequitable conduct or had *failed to act appropriately* when he knew, or should have known, that something was amiss with respect to his property rights." 436 N.Y.S.2d at 75. (Emphasis added.)

Defendants have not suggested that NYSERDA's conduct regarding the spent fuel's presence at the Center has at any time been "inappropriate" in light of its shifting legal interests in respect to the Center, and no

colorable basis for such a conclusion has been suggested or appears in the record. *Cf. Galway v. M.E.R. Co. et al.,* 128 N.Y. 132, 153, 28 N.E. 479, 484 (1891) ("[N]o period of inaction merely has been held sufficient to justify a * * * trespass, unless it has continued for such a length of time as will authorize the presumption of a grant.")

■ From the foregoing the conclusion plainly follows that equitable considerations present no obstacle to NYSERDA's demand for a declaration of liability for prompt removal. Apart from their incorrect contention that NYSERDA is not harmed by the continued presence of defendants' spent fuel at the Center and their unsubstantial allegation of risk to the public by removal of their spent fuel, defendants' appeal to equity is essentially that, by their continued unauthorized appropriation of the property of NYSERDA to their own use, defendants would derive a much greater benefit than would NYSERDA by the latter's being restored to control over its property. To this suggestion a condign reply was given long ago in *Corning v. Troy Iron and Nail Factory,* 40 N.Y. 191, 205 (1869): "The bare statement of the question would seem to suggest the only proper answer. The very idea of justice is to give each one his due."

The conclusion is that defendants have raised no valid objection, legal or equitable, to NYSERDA's demand for partial summary judgment declaring defendants to be trespassers and liable for the removal of their spent fuel stored at the Center; nor have they raised any colorable dispute as to any facts material to this demand, except for their contention that plaintiff has not shown defendants to possess the intent requisite for commission of the charged trespass. Such intent cannot exist unless and until NYSERDA serves upon each defendant an unequivocal demand that it remove its spent fuel from the Center and such unequivocal demand is thereafter ignored by the defendant. Should there come a time when some or all of the utility defendants have been declared liable for prompt removal of their fuel wastes, it will perhaps then be necessary to resolve factual disputes as to the execution of injunctions based upon such declaration. However, the future prospect of such a need poses no obstacle to the requested declaratory relief, defendants' contrary assertions notwithstanding.

*The Contract Claim*

NYSERDA seeks to enforce the 1978 Storage Agreements between the respective utility defendants and NFS as a third-party beneficiary of those agreements, which are fully set forth in relevant part above. The relief sought on this motion is a declaratory judgment that under these contracts defendants are liable to NYSERDA for the prompt removal of their spent fuel from the Center. NYSERDA relies primarily upon the language of the agreements to the effect that:

> "It is recognized * * * that NFS may have to request the Customer to remove the stored assemblies if * * * NYSERDA requests NFS to have the stored assemblies removed in connection with NYSERDA's disposition of the [Center] prior to or upon the expiration of the Lease."

NYSERDA relies upon NFS's April 7, 1981 request for removal of the spent fuel commencing June 1, 1981, made at NYSERDA's instance, as constituting a request within the contemplation of this contractual provision, and seeks to enforce defendants' obligation to respond to that request as provided by the agreements. This obligation is characterized somewhat differently in the case of each utility defendant. Wisconsin agreed merely to remove its stored waste commencing on the date specified in any request. GPUSC as agent for Jersey agreed the same, "subject to the Customer using its best efforts to arrange for a carrier and shipping cask to transfer the stored assemblies and for a licensed storage location to ship them to." Comm.Ed. agreed the same, "subject to [Comm.Ed.'s] obtaining proper governmental authorizations and/or permits," and that it would have twelve months after commencement to complete removal.

It has been satisfactorily established, by paragraph 17 of the affidavit of NFS's Gen-

eral Counsel Brook, who negotiated the Storage Agreements for NFS, that NFS's purpose in securing these removal promises was to protect itself from possible liability to remove the spent fuel and to avoid litigation with NYSERDA over that point; it is clear too, as indicated by Brook and as one would naturally expect, that "NFS recognized that these removal provisions would be to the mutual benefit of NFS and [NYSERDA] if [NYSERDA] decided to have the fuel removed."

Defendants urge among other things that NFS's intention was to secure a benefit merely to itself and not to NYSERDA, that the utility defendants had no intention of undertaking to render performance directly to NYSERDA under the Storage Agreements' removal clauses and that various alleged contractual conditions for an effective removal demand (notably a "disposition" of the Center by NYSERDA on or before the expiration date of NFS's lease and the availability of alternative storage sites away from defendants' own reactors) have not been fulfilled.

To the first of these objections NYSERDA replies quite sensibly that, under the law of New York, if a contract obviously confers a benefit directly upon a third person, the parties will be presumed to have intended such and the third person will be accorded the right to enforce such contract, although the chief *purpose* of the provision sought to be enforced by such third person may have been to secure the advantage to the parties in privity or only of the promisee. *See, e.g., United States v. Jacobs,* 304 F.Supp. 613 (S.D.N.Y.1969); *Durnherr v. Rau,* 135 N.Y. 219, 32 N.E. 49 (1892); 2 Williston, *Law of Contracts* 792–793 (3d ed. 1959). To the second objection the equally sensible reply is made that, to the extent that the intention of the parties to a contract that a third person will or may benefit from its performance is relevant to the right of such third person to enforce the contract, the promisee's intention is of greater importance than that of the promisor. *E.g., Goodman-Marks Assoc. v. Westbury Post Assoc.,* 70 A.D.2d 145, 420 N.Y.

S.2d 26 (2d Dept.1979); 2 Williston, *supra,* at 836. Thus it is clear that, for third-party enforcement purposes, there must have been either a presumptive or expressed *intent* to benefit the third person (*e.g., Beveridge v. N.Y.E.R. Co.,* 112 N.Y. 1, 26, 19 N.E. 489 (1889); *Lawrence v. Fox,* 20 N.Y. 268 (1859)), that the need for such intent does not preclude the existence of a selfish motive for the securing of such benefit to another and that it is the promisee's intent *vel non* to benefit the third person which is controlling.

In the effort to determine when such an intent is present courts distinguish between direct and indirect beneficiaries—*i.e.,* those to whom performance will be directly rendered under the contract, as opposed to those who will merely receive some benefit in an incidental way, as a by-product of the agreement.

> "The benefit must be one that is not merely incidental. It must be immediate in such a sense and to such a degree as to indicate the assumption of a duty to make reparation if the benefit is lost." *Associated Flour Haulers, etc., v. Hoffman,* 282 N.Y. 173, 180, 26 N.E.2d 7 (1940).

*See, also, Goodman-Marks Assoc., supra,* 420 N.Y.S.2d, at 28–29. The requisite intent to confer a benefit directly upon the third person must clearly appear on the face of the agreement. *Beveridge v. N.Y.E.R. Co., supra,* 112 N.Y. at 26, 19 N.E. 489; *Flemington Nat. Bank, Etc. v. Domler Leasing,* 65 A.D.2d 29, 410 N.Y.S.2d 75, 78 (1st Dept. 1978).

The doctrine of third-party beneficiaries is an exception to the ancient common law rule that only parties in privity to a contract may enforce it. The exception's recognition was long in coming and in the days of its infancy was strongly opposed by jurists of quality. *See, e.g., Lawrence v. Fox, supra,* at 275 (Comstock, J., dissenting). The purpose of its adoption was to achieve a just result between or among the parties before the court.

> "It has been said that 'the establishment of this doctrine has been gradual, and is a

victory of practical utility over theory, of equity over technical subtlety.' * * * The reasons for this view are that it is just and practical to permit the person for whose benefit the contract is made to enforce it against one whose duty it is to pay." *Seaver v. Ransom,* 224 N.Y. 233, 237, 120 N.E. 639 (1918).[9]

This origin of the third-party beneficiary doctrine in a desire to serve fundamental justice is important to this case. Here the putative third-party beneficiary has no need for recourse to this essentially equitable doctrine in order to achieve equity, for essentially the same end sought by NYSERDA is reachable by means of independent legal principles. The laws of tort and of property right provide that NYSERDA may achieve the removal of the spent fuel by judicial decree upon making a proper demand for removal, as demonstrated above. Also, it does not appear that any advantage in respect to the availability or measure of damages is to be gained by recognition of the third-party beneficiary claim. As explained hereafter, NYSERDA is entitled to adequate damages for unjust enrichment at least since NFS turned the Center over to the DOE (and it is unlikely that NYSERDA could show any *contractual* damages prior to that time, as it appears that NFS bore the expense of storage until then) and for trespass if and when a removal demand is made and from that point on.

It is fundamental that equity does not act where a plaintiff has an adequate legal remedy; NYSERDA's claim to enforcement of the storage agreements as a third-party beneficiary being essentially an appeal to equity, it cannot succeed in the presence of an adequate remedy at law for the spent fuel's removal. An injunction requiring defendants to remove their spent fuel from the Center, based on a finding that its continued presence there is trespassory, would also be an exercise of equity. However such exercise would be preferable to permitting enforcement by NYSERDA of the Storage Agreements because it would be based upon a clear legal right. And, although NYSERDA's claim for damages for unjust enrichment is essentially equitable, NYSERDA's available damages under this theory are undoubtedly at least equal to any possible contractual damages, and the entitlement thereto is free of the doubts involved in the third-party beneficiary claim.

What has been said above concerning the existence of NYSERDA's alternative legal remedies bears too upon the interpretation to be given the removal provisions and the existence of the necessary intent by NFS to confer a benefit upon NYSERDA in securing the removal promises. The chief benefit claimed to have been sought was an easy and early removal of the spent fuel. That benefit has been lost and is now impossible to realize. If it were urged that NFS intended to secure the added benefit of providing NYSERDA with grounds for demanding removal of the spent fuel, the reply would be made that this is no benefit at all because NYSERDA has a plain remedy to achieve the fuel's removal; the contractual remedy is mere redundancy. It is elementary that for third-party enforcement purposes the contract must confer a benefit upon the third-party. Thus NYSERDA's effort to enforce the removal provisions as a third-party beneficiary must fail through lack of any benefit to NYSERDA from those provisions, once it becomes necessary to seek their enforcement.

This disposition of the third-party beneficiary claim makes unnecessary consideration of the parties' further contentions in regard thereto.

*Quasi-contract/Unjust Enrichment*

NYSERDA's final claim to relief on its motion for partial summary judgment is for

9. *See, also, Lawrence v. Fox, supra,* 20 N.Y. at 275:

"No one can doubt that he owes the sum of money demanded of him, or that in accordance with his promise it was his duty to have paid it to the plaintiff; * * * if, therefore, it could be shown that a more strict and technically accurate application of the rules applied, would lead to a different result * * *, the effort should not be made in the face of manifest justice."

a declaration that the utility defendants are liable to it under quasi-contract theory for their unjust enrichment from the continued storage of their spent fuel at the Center without payment and without permission.

The noble principle invoked by NYSERDA, which relies directly upon ancient concepts of rectitude,[10] was aptly stated in the leading New York decision *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (1916):

"A *quasi* or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In truth it is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it."

■ There can be no doubt that the undisputed facts in this case entitle NYSERDA to damages for the utility defendants' unjust enrichment by their storage of their spent fuel at the Center without cost to themselves, at least for the period since the DOE took over the Center from NFS. These defendants were informed as early as December 1980, by letters from NYSERDA's General Counsel, of that which they must be presumed to have realized in any event—to wit, that, in view of the approaching termination of NFS's lease and the return of the Center to NYSERDA or to the DOE as NYSERDA's licensee or lessee, their spent fuel could not continue to be stored there, or at least not on the same terms that had been set between NFS and the respective utility defendants. The utility defendants are chargeable with the rudimentary understanding that NFS as lessee of the Center could not confer upon them any greater contractual right to the Center's use than NFS itself enjoyed. Thus if knowledge of lack of authorization or legal right to store their spent fuel at the Center were necessary to hold the utility defendants liable to NYSERDA for their use of the Center without payment—which it is not—such knowledge was certainly theirs, at least as of the date of the DOE takeover, if not sooner.

■ Defendants seek to make an issue of fact out of the question of their alleged enrichment—whether or not they indeed benefitted by the storage of their fuel at the Center without payment therefor. Defendants do not actually claim, however, that they have not financially benefitted from the storage. Indeed, their representations that they have always stood ready to pay amounts set by themselves for the storage belie their contention that enrichment *vel non* is a disputed question of material fact in this case; the cases cited for that proposition (*Tides Property Owners Ass'n, Inc. v. Kalkhof,* 77 A.D.2d 620, 430 N.Y.S.2d 117 (2d Dept.1980); *Mohegan Colony Ass'n,*

---

**10.** Thus Dean Pound, in tracing the nature of obligations of restitution analogous to contractual obligations, observed:

"Recognized rights *in personam* in this category have their rational basis in a corollary of the jural postulate that in civilized society men must be able to assume that those with whom they deal in the general intercourse of society will act in good faith. The corollary is that men must be able to assume that others with whom they have dealings will restore specifically or by equivalent what comes to them by mistake or unanticipated situation whereby they receive, at another's expense, what they could not reasonably have expected to receive under the actual circumstances.

\* \* \* \* \* \*

"As it has come down to us from the Roman law, the principle is that one who has been unjustly enriched at the expense of another is required to make restitution to the other. The books commonly speak of 'unjust enrichment,' 'unjustified enrichment' (*ungerechtfertigte Bereicherung*), or 'enrichment without cause' (*enrichissement sans cause*) going back to the Roman maxim that it is in accord with the law of nature that no one should be the richer through detriment or wrong to another." Ⅹ R. Pound, *Jurisprudence* 242–244 (1959).

**982**

*Inc. v. Picone,* 61 A.D.2d 809, 402 N.Y.S.2d 40 (2d Dept.1978); *Robbins v. Ogden Corp.,* 490 F.Supp. 801 (S.D.N.Y.1980)) are thus inapposite, except in regard to the period from the termination of NFS's lease until the DOE takeover. There do exist disputed issues of fact, as well as of law, that have not been adequately addressed on this motion, regarding NFS's status vis-a-vis the Center in this interim period. NFS apparently maintained defendants' spent fuel at its own expense during such time and it is to be questioned whether NYSERDA may recover from the utility defendants for the spent fuel's storage prior to the DOE takeover. After such takeover, however, NYSERDA as owner of the Center, in the Cooperative Agreement with the DOE had reserved the right to store defendants' spent fuel at the Center and has since paid substantial amounts to the DOE to maintain and survey such storage as NYSERDA's agent. Defendants' efforts to dispute their enrichment at NYSERDA's expense, at least after the DOE takeover, and their implications that perhaps they are entitled to free storage of their spent fuel on NYSERDA's property serve only to underscore the conclusion that in equity and good conscience defendants must be required to pay NYSERDA for the benefit they have received from its property.

■ Defendants' further contentions that fault or misconduct is a necessary predicate for imposition of recovery for unjust enrichment and that their good faith in negotiating with NYSERDA for continued storage militates against a finding of unjust enrichment are without merit. Defendants have misconceived the law. There is no requirement of fault or misconduct; their asserted good faith is immaterial to whether, their negotiations with NYSERDA having failed, they must be made to pay for the substantial benefits they have received to date. *See, e.g., Eightway Corp. v. Dime Sav. Bank, Etc.,* 94 Misc.2d 274, 404 N.Y.S.2d 302, 307 (N.Y.City Civ.Ct.1978),

*aff'd,* 99 Misc.2d 989, 420 N.Y.S.2d 836 (Sup. Ct., App.Term, 2d & 11th J.D.1979); *Rand Products Co., Inc. v. Mintz,* 72 Misc.2d 621, 340 N.Y.S.2d 444 (Sup.Ct., App.Term, 1st Dept.1973); *Restatement of the Law of Restitution,* § 155; V R. Pound, *Jurisprudence, supra, loc. cit.* The case relied upon by defendants as requiring fault or misconduct, *Penin. & Oriental Steam Nav. v. Overseas Car.,* 418 F.Supp. 656, 659 (S.D.N.Y. 1976),[11] continues, in the sentence following that alluded to by defendants, to recognize that taking "undue advantage" of a plaintiff is sufficient fault for purposes of quasi-contract. Assuming *arguendo* that fault, misconduct or taking undue advantage of another is an element required for recovery in quasi-contract, the requirement is met here, for it is clear that the utility defendants have taken undue advantage of NYSERDA's inability under all the circumstances to unilaterally remove defendants' spent fuel from the Center. The utility defendants have received a substantial benefit from NYSERDA (at least since the DOE takeover), a benefit for which, had NYSERDA not been in essentially a defenseless position, these defendants would have had to bargain. Equity and good conscience require that the utility defendants pay NYSERDA for this benefit, at a rate to be determined upon competent evidence of the value to such defendants of the storage during the period for which it is ultimately determined that they are liable therefor to NYSERDA, but at least since the DOE takeover on February 25, 1982.

" 'The obligation implied under such circumstances * * * is such as justice would dictate, and must conform to what the court may assume would have been the agreement of the parties if the situation had been anticipated and provided for.' " *Bradkin v. Leverton,* 26 N.Y.2d 192, 196–197, 309 N.Y.S.2d 192, 195–196, 257 N.E.2d 643, 645 (1970).

11. The only other pertinent decisional authority cited, *Paramount Film Distributing Corp. v. State,* 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393, 285 N.E.2d 695, 698 (1972), merely notes

"whether the defendant's conduct was tortious or fraudulent" as one of a number of "broad considerations of equity and justice" generally pertinent to a claim of unjust enrichment.

*See, also, Evans v. City of Johnstown,* 96 Misc.2d 755, 410 N.Y.S.2d 199, 204 (Sup.Ct., Fulton Co.1978); *Rand Products Co., Inc. v. Mintz, supra,* 340 N.Y.S.2d, at 445, *aff'g* 69 Misc.2d 1055, 332 N.Y.S.2d, 452 at 456; *Restatement of the Law of Restitution,* § 155.

■ Defendants' reliance upon section 129(2) of the *Restatement of the Law of Restitution,* providing that "[a] person who has trespassed upon the land of another is not thereby under a duty of restitution to the other for the value of its use," is misplaced, principally for the reason that the utility defendants have not yet become trespassers. Moreover, as pointed out in Comment (a) of section 129, should defendants become trespassers in the future, it is apparent that they would be liable to NYSERDA thereafter for essentially the same measure of damages as is appropriate under unjust enrichment and restitution principles. *See also DeCamp v. Bullard,* 159 N.Y. 450, 54 N.E. 26 (1899); *Granchelli v. Walter S. Johnson Bldg. Co.,* 85 A.D.2d 891, 446 N.Y.S.2d 755, 756 (4th Dept.1981); *West St. Auto Service, Inc. v. Schmidt,* 26 A.D.2d 662, 272 N.Y.S.2d 615 (2d Dept.1966).

■ Finally, defendants' contention that the equities of NYSERDA's unjust enrichment claim must be examined upon trial in the full context of the "human setting" involved (*McGrath v. Hilding,* 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 606, 363 N.E.2d 328, 331 (1977)) is unpersuasive. The human setting factors urged by defendants—the alleged public interest in not unnecessarily transporting spent fuel, the supposed minimal effect of the spent fuel on NYSERDA's property interests, the costs of retrieval to the utility defendants and their public and the defendants' willingness to pay NYSERDA storage fees dictated by themselves—have all been considered hereinabove and rejected as either immaterial or insufficiently substantiated to raise a disputed issue of fact on this motion for partial summary judgment (*Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d, at 445). In any case, the inquiry called for by *McGrath v. Hilding* and the cases cited therein pertains only to a claim of creation of a constructive trust, which will be imposed "when an unfulfilled promise to convey an interest in land induces another, in the context of a confidential or fiduciary relationship, to make a transfer resulting in unjust enrichment." 41 N.Y.2d, at 628–629, 394 N.Y.S.2d, at 605, 363 N.E.2d, at 330. The "human setting" inquiry required in such cases has no pertinence to determining whether unjust enrichment has occurred in this case.

*Defendants' motion for a continuance*

■ There remains only the matter of the GPU defendants' motion for a continuance pursuant to Fed.R.Civ.P. rule 56(f) to permit further discovery relevant to NYSERDA's motion for partial summary judgment. The burden is upon movants to show the need for such a continuance

"by presenting specific facts explaining the inability to make a substantive response as required by rule 56(e) and by specifically demonstrating 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Securities & Exchg. Com'n v. Spence & Green,* 612 F.2d 896, 901 (5th Cir.1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981).

The major portion of the grounds upon which a continuance is sought relates to an asserted need for discovery pertinent to NYSERDA's third-party beneficiary contract claim, upon which claim I have denied plaintiff's demand for relief. Discovery is sought also to bolster the claim that NYSERDA is a successor-bailee of the spent fuel and cannot therefore sue in trespass for its removal. This claim has been mooted by my rejection of the bailee defense as inappropriate to this case; a continuance for the discovery of other matters pertaining to NYSERDA's trespass claim is unnecessary because of the within denial of summary judgment on that claim. Finally, the continuance is sought for discovery regarding issues pertinent to the timing of defendants' removal of the spent fuel, the public

interest regarding its removal and return to defendants' own storage pools as opposed to its continued storage at the Center and the availability of alternative storage locations, all said to be pertinent to NYSERDA's demand for a declaration of liability for prompt removal of the spent fuel. Without commenting upon the relevance of these matters or detracting from anything said hereinabove regarding them, it suffices to note that no declaration of liability for prompt removal is made at this time, so that the demand for time for discovery in regard to the removal issues is not ripe.

*Conclusion*

In accordance with the foregoing the utility defendants' motions to strike the affidavit of Clemente are hereby ORDERED denied except as indicated herein, the GPU defendants' motion for a continuance is hereby ORDERED denied, NYSERDA's motion for a partial summary judgment declaring the utility defendants the owners of the spent fuel ascribed to them in the Amended Complaint and in NYSERDA's moving papers is hereby ORDERED granted, NYSERDA's motion for partial summary judgment for a declaration that the utility defendants are liable for the prompt removal of their spent fuel from the Center is hereby ORDERED denied, and NYSERDA's motion for partial summary judgment declaring the liability of the utility defendants for unjust enrichment is hereby ORDERED granted to the extent that NYSERDA's motion pertains to the period beginning February 25, 1982 and is otherwise hereby ORDERED denied. The denials of NYSERDA's motion pertaining to the claims of trespass and of unjust enrichment for a period or periods prior to February 25, 1982 are made without prejudice to renewal of such motions in accord with the views expressed herein.